UNITED STATES of America,
Plaintiff-Appellee,

v.

David Leslie MIDDLEBROOKS,
Defendant-Appellant.

No. 79–5191.

United States Court of Appeals,
Fifth Circuit.

June 2, 1980.

Rehearing Granted Aug. 14, 1980.

---

\* Senior District Judge of the Northern District of Alabama sitting by designation.

Paul G. Komarek, Lynn Haven, Fla. (Court-appointed), for defendant-appellant.

Nicholas P. Geeker, U. S. Atty., Pensacola, Fla., Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before AINSWORTH and HENDERSON, Circuit Judges, and HUNTER *, District Judge.

* District Judge of the Western District of Louisiana, sitting by designation.

HENDERSON, Circuit Judge:

David Leslie Middlebrooks was indicted by a grand jury in the Northern District of Florida for knowingly conspiring with various persons to possess with the intent to distribute marijuana (Count One) and conspiring with the same persons to possess with the intent to distribute cocaine (Count Two). 21 U.S.C.A. §§ 841(a)(1), 846.

At the time of his alleged participation in the conspiracies, the defendant was a deputy sheriff in Bay County, Florida. At the trial, the government sought to prove that his co-conspirators paid the defendant to keep them informed of local drug enforcement activities, especially the authorities' knowledge of the co-conspirators' illegal drug operation.[1]

The jury returned a verdict of guilty on both counts and the district judge sentenced the defendant to five years on each count, to run concurrently, as well as a concurrent special parole term of three years, imposed pursuant to the provisions of 21 U.S.C.A. § 841(b)(1)(A). In this appeal he raises a number of issues.

■ At the trial, the government introduced tapes of telephone conversations made during a court-ordered wiretap of Louie Hyde's residence telephone. The district court denied the defendant's motion to suppress the contents of the intercepted conversations and the defendant appeals that ruling on the basis of statements made at the trial by Drug Enforcement Agent Clarence S. Rowell, Jr. The defendant charges that Agent Rowell, upon whose affidavit the wiretap authorization was granted, testified that he had no idea of how many surveillances of the illegal drug operations were made prior to the wiretap application, or when or where they took place, and thus his statement in the affidavit that normal investigatory techniques had failed was untruthful. The defendant makes a similar attack on Agent Rowell's veracity based on his statement at the trial that he did not believe there was any direction of surveillance.

The defendant takes Agent Rowell's testimony completely out of context. Agent Rowell actually said that there was no way he could remember the number or location of all surveillances made before he applied for a wiretap, although he affirmed that an extensive investigation took place. We note also that in *United States v. Hyde*, 574 F.2d 856, 867–69 (5th Cir. 1978), an exhaustive review was made of the investigative procedures used by the government before this same wiretap and the panel was satisfied that normal surveillance techniques had indeed failed. And, in making his statement concerning the "direction of surveillance," Agent Rowell was simply stating that he *personally* did not direct the investigation at this time, but rather that it was a joint operation of several law enforcement agencies. The district court was correct in denying the motion to suppress.

The most troubling assignment of error is the defendant's contention that he did not get a fair trial because of the district judge's conduct. He points to several instances where the judge interjected himself into the trial by questioning witnesses, telling the defendant's attorney that he was going into irrelevant matter, complaining about too many bench conferences, and warning the defendant's attorney that he should move faster. Only three of these occurrences warrant our attention. The rest either took place outside the presence of the jury or were legitimate attempts by the trial judge to control the proceedings.

1. Named as co-conspirators, but not indicted, were Louie Lee Hyde, Joe Middlebrooks, Patricia Jean ("Jeannie") Middlebrooks and Pedro ("Pete") Arenas, whose convictions for conspiracy to possess with intent to distribute marijuana and cocaine, and possession, with intent to distribute, marijuana and cocaine were upheld in *United States v. Hyde*, 574 F.2d 856 (5th Cir. 1978). Also named were Jackie Hyde, Anita Clancy, Lonnie Mims, Tondola Evans and Nolan O'Quinn. In *United States v. Harbin*, 601 F.2d 773 (5th Cir. 1979), we affirmed Mims' conviction for conspiracy to possess marijuana with the intent to distribute, but reversed for insufficient evidence O'Quinn's conviction for conspiracy to possess marijuana and cocaine with intent to distribute.

John Louie Johnson, a defense witness, testified that while he was a police officer the defendant told him about his brother Joe Middlebrooks' involvement in illegal drug trafficking, and sought his advice as to what he should do about it. Johnson related that he set up a meeting between Agent Rowell and the defendant at which time they discussed the problem. After the government's cross-examination of Johnson, the judge asked the witness why the defendant would have come to him, a law enforcement officer, concerning his brother's implication in criminal activity. While this may not have been the judge's purpose, the jury could have concluded that he was questioning the witnesses' credibility.[2]

2. "THE COURT: Let me ask you a question about that. Something is puzzling me, sir. Why would Mr. Middlebrooks give you all this information about his brother when you were a police officer—
 "MR. MODESITT: Your Honor, we can't hear you. I'm sorry.
 "THE COURT: How's that?
 "MR. MODESITT: We can't hear a word you say.
 "THE COURT: I said Mr. Middlebrooks—do you know any reason why Mr. Middlebrooks would give you this information about his brother instead of giving it to someone else in authority?
 "A. Well, Dave and I are very good friends and have been for quite a bit of time.
 "THE COURT: He didn't tell you whether he had told anyone else this information, or did he? Did he tell you? Did you ask him whether he'd given this information to anyone else?
 "A. No, I advised him that he needed to talk to somebody else.
 "THE COURT: I see. All right, go ahead, Mr. Daniel."
 (Record, hereinafter referred to as "R.," Vol. 4, 213.)

3. "THE COURT: It's not really of much concern to you whether someone violated the law?
 "A. Yes, sir.
 "THE COURT: You make your judgment on the basis of not whether they violated the law but how you want to testify?
 "A. No, sir.
 "THE COURT: Is that your concept of it?
 "A. No, sir.
 "THE COURT: Then what are you saying?
 "A. I'm saying that I will give the evidence that I can give. I—if I don't know anything about a certain operation or if it's just hearsay then it wouldn't be admissible as evidence.
 "THE COURT: Well, now, that wouldn't exactly be your decision, would it? Anyhow—

Tondola Evans, a crucial witness for the defense who had been closely connected with the co-conspirators, testified that the defendant was not connected with the drug conspiracies. The district judge interrupted the government's cross-examination to ask her several questions about her motive in testifying, clearly indicating that he doubted her credibility.[3]

Finally, David Middlebrooks took the stand in his own behalf. During his testimony the judge interrupted him two times to get him to clarify his answer. And, while the government was cross-examining the defendant, the judge interrupted to admonish him to answer a question with a "yes" or a "no."[4]

"A. Well—
"THE COURT: You are not fully and freely volunteering testimony about criminal acts being done; you're testifying under immunity and that's the reason you're saying anything at all, is that it?
"A. Yes, sir.
"THE COURT: All right, go ahead, Mr. Modesitt.

＊　　＊　　＊　　＊　　＊　　＊

"THE COURT: Well, the truth is you really don't know, do you? You're just assuming he didn't do it. You really don't have any personal knowledge.
"A. My personal opinion is that—
"THE COURT: You're not asked for your opinion. Do you know? Do you have any personal knowledge aside from your opinion whether or not he took any money from anybody?
"A. No, sir.
"THE COURT: Then why didn't you say so? And I want you to answer questions from now on without giving us opinions and those kinds of things.
"A. Yes, sir."
(R., Vol. 4, 305–06; 308–09.)

4. "THE COURT: Mr. Middlebrooks, are you saying you did know about the arrest in the Jeep but did not know what the charge was?
 "A. I knew whose Jeep it was at that time.
 "THE COURT: Did you know what the charge was?
 "A. The Sheriff told me later when he called me in, they had arrested two girls in Nolan O'Quinn's Jeep.
 "THE COURT: Within a few days you knew what the charge was?
 "A. I knew that night. When I went to work that night, the Jeep was there. The Sheriff called me upstairs. I think he said they

A judge may question a witness but he must be "careful to preserve an attitude of impartiality and guard against giving the jury any impression that the court [is] of the opinion that the defendant [is] guilty." *Gomila v. United States*, 146 F.2d 372, 374 (5th Cir. 1944).

> When a judge interjects himself into a trial by questioning witnesses, the judge places the opposing counsel in a disadvantageous position. The attorney may hesitate to object to the judge's examination for fear of creating a conflict, or appearing to create a conflict, between the judge and himself. Therefore, *when the attorneys are competently conducting their cases, it is improper for the trial judge to question the witness.*

*United States v. Daniels*, 572 F.2d 535, 541 (5th Cir. 1978) (emphasis added, citation omitted). *Accord, United States v. Welliver*, 601 F.2d 203, 208–09 (5th Cir. 1979). While error may sometimes be cured by an instruction to the jury to disregard the judge's questions or comments, some remarks are so prejudicial · that even the strongest admonition to the jury will not suffice. *Bursten v. United States*, 395 F.2d 976, 983 (5th Cir. 1968).

Looking at the proceedings as a whole, we are satisfied that the defendant received a fair and impartial trial. The judge's questions of Johnson and Evans were not exactly a model of judicial decorum, particularly the judge's critical interrogation of Evans. And, while his remarks to the defendant were a sincere attempt to clarify his answers, they too should have been phrased differently. When a defendant takes the stand in his own behalf, any unnecessary comments by the court are too likely to have a detrimental effect on the jury's ability to decide the case impartially. "It is well known . . . that juries are highly sensitive to every utterance by the trial judge, the trial arbiter . . . ." *Bursten v. United States*, 395 F.2d at 983. This is especially true where the judge's remarks are directed to the defendant. In this instance, though, the judge strongly admonished the jury that they must ignore any opinions as to the facts which the court may have given during the trial, and that they were the sole arbiters of the credibility of the witnesses.[5] These were isolated incidents in a four-day trial in which there was ample evidence upon which to convict the defendant for his part in the marijuana conspiracy.

The defendant's contentions that the trial court erred in imposing two concurrent three-year special parole terms and in refusing to allow into evidence results of a polygraph test are foreclosed by *Cantu v. United States*, 598 F.2d 471 (5th Cir. 1979), and ·*United States v. Frogge*, 476 F.2d 969 (5th Cir.), *cert. denied*, 414 U.S. 849, 94 S.Ct. 138, 38 L.Ed.2d 97 (1973), respectively; *see also United States v. Masri*, 547 F.2d 932, 936 (5th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

---

arrested Nolan O'Quinn and two girls or arrested two girls in his Jeep.

. \* \* \* \* \* \*

"THE COURT: Mr. Middlebrooks, I think we'll get along better if you will just answer these questions. He wants to know did you call Louie Lee Hyde about his case. That's what he asked. Your answer, I think, should be either yes or no.

\* \* \* \* \* \*

"THE COURT: Mr. Middlebrooks, he was asking about a particular man and he wanted to know.

"A. Yes, sir, this is on Mr. Eldridge's case. We went to Columbus, Georgia, and Atlanta.

"THE COURT: That's what he was asking you about. He wanted to know if you were an investigator in that connection.

"A. Yes, sir.

"THE COURT: Go ahead, Mr. Modesitt."

(R., Vol. 5, 79, 87, 95.)

**5.** "The *evidence should be considered and viewed by the jurors in the light of their own observations and experiences. If during the trial the court has intimated any opinion as to the facts, the jury may entirely disregard such intimation, since the jurors alone are the sole and exclusive judges of the facts.* ·

"You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves."

Jury Instructions, at 2–3.

■ Equally without merit is the defendant's insistence that the trial court erred in refusing to give his requested jury instructions numbered 8 and 10, which stated, in essence, that more is required for conviction than association with alleged co-conspirators or performance of an act which aids the conspiracy. The court charged that mere presence, similarity of conduct or association did not necessarily establish proof of a conspiracy, that one with no knowledge of the conspiracy who happens to act in a way that advances the objective of the conspiracy does not thereby become a conspirator, that the gist of conspiracy is an agreement to disobey the law, that the defendant must have willfully become a member of the conspiracy, and that the defendant must have had specific intent. Both "willfully" and "specific intent" were defined for the jury. This instruction adequately covered the same points addressed by the defendant's requested charges, and, in fact, stated the same principles more clearly and articulately.

■ The defendant makes his most vigorous attack on the sufficiency of the evidence supporting his conviction. The essence of a conspiracy is an unlawful agreement.[6] *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616, 622 (1975). The conspirator must knowingly agree to join others to bring about a common goal. *United States v. Perez*, 489 F.2d 51, 61 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). However, proof that a defendant may have intentionally aided a criminal act or that he may have intended to do so in the future is not sufficient; the government must show the defendant *agreed* with others that together they would accomplish the object of the unlawful conspiracy. "[T]here must be proof beyond a reasonable doubt that a conspiracy existed, that he knew of it, and that, with this knowledge, he voluntarily became a part of it." *United States v. Harbin*, 601 F.2d 773, 781 (5th Cir. 1979),

*citing United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Caro*, 569 F.2d 411, 416 (5th Cir. 1978); *United States v. Gutierrez*, 559 F.2d 1278, 1280 (5th Cir. 1977).

■ There is rarely any direct evidence of an agreement to join a criminal conspiracy, and thus the defendant's assent can be inferred from acts which furthered the conspiracy's purpose. *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). It is not necessary for a conspirator to know each of the other co-conspirators or be privy to details of each enterprise comprising the conspiracy as long as he knows of the conspiracy and associates himself with it. *United States v. Ochoa*, 609 F.2d 198, 202 (5th Cir. 1980), *citing United States v. Harbin*, at 781.

■ The defendant's attack on the sufficiency of the evidence consists mainly of alternative, innocent explanations of his conduct and a discourse on prosecutorial abuse of the conspiracy laws. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accepting all reasonable inferences and credibility choices that support the verdict, *United States v. Becker*, 569 F.2d 951, 959 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *United States v. Villarreal*, 546 F.2d 1145 (5th Cir.) (per curiam), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977), we find substantial evidence, beyond a reasonable doubt, *United States v. Malatesta*, 590 F.2d at 1382, that the accused knowingly participated in a conspiracy to possess marijuana with the intent to distribute.

There is no doubt that there existed a conspiracy to possess marijuana with the intent to distribute. And, there is ample evidence that the defendant knew of the conspiracy. Anita Clancy, a member of the

---

6. No overt act need be alleged or proved in a prosecution for conspiracy under 21 U.S.C.A. § 846. *United States v. Palacios*, 556 F.2d 1359, 1364 n. 9 (5th Cir. 1977); *United States v.*

*Beasley*, 519 F.2d 233, 247 (5th Cir. 1975), vacated and remanded on other grounds, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976).

conspiracy, testified that the defendant was present at a meeting at which marijuana dealing was discussed among Joe Middlebrooks, Nolan O'Quinn and Louie Hyde. There was also evidence that the defendant knew of Joe and Jeannie Middlebrooks' trips to Texas to purchase marijuana for distribution in Florida. Finally, the government proved that the defendant voluntarily became a part of the conspiracy. Both Anita Clancy and Lonnie Mims testified it was their understanding that the defendant was to take care of any problems that might arise with the law enforcement authorities. The most damaging testimony is that of Louie Hyde and the tapes of conversations between Hyde and the defendant. We think these established beyond a reasonable doubt that the defendant was giving Hyde information on the activity of area drug enforcement agencies in exchange for money and in furtherance of the marijuana conspiracy. Despite the attempt to explain these transactions as loans from Hyde and the defendant's brother, Joe, the jury could certainly conclude otherwise.

 In contrast, we find that the government failed to show that the defendant knew of or willingly participated in a conspiracy to possess cocaine with the intent to distribute, although undoubtedly such a conspiracy did exist.[7] Without this proof, the conviction on Count Two of the indictment cannot stand. The fact that the information the defendant gave to the marijuana conspirators, which he thought would aid that conspiracy, may have also aided them in their cocaine dealings does not make him a co-conspirator absent proof of his knowledge of the existence of that cocaine conspiracy.

At the trial, none of the evidence in any way connected the defendant with a cocaine conspiracy. There was proof that Joe and Jeannie Middlebrooks went to Texas to buy this drug, and that Louie Hyde supplied at least some of the purchase money. A taped conversation shows that Louie Hyde and Nolan O'Quinn discussed the price and quality of Joe and Jeannie Middlebrooks' cocaine purchases in Texas. Another tape reveals a conversation among Joe and Jeannie Middlebrooks and Pete Arenas concerning a buy in Texas. Anita Clancy admitted that she dealt in cocaine for Louie Hyde, but there was no evidence as to the time of this activity, and, in a statement read at the trial, Robert Vaughn said that he and Anita Clancy had been arrested for cocaine possession. Louie Hyde testified that Joe Middlebrooks sold his cocaine in Texas, not Florida, although he thought he was bringing some cocaine back to Florida when he was arrested. Robert Vaughn also stated that Joe would purchase both cocaine and marijuana in Texas, sell the former in Texas, and return the latter to Florida for distribution. Thus, even the geographical distance between the defendant's conduct, the only purpose of which was to advise of *local* law enforcement operations, and most of the activity directed at carrying out the

---

7. The government argues that once we find a single conspiracy sufficient to support a conviction on one count of the indictment, the concurrent sentence doctrine eliminates the need to address the other count. The defendant points to the United States Parole Commission "Guidelines for Decision-Making" which establishes the customary time to be served before release depending on the severity of the offense ("Low" to "Greatest II") and the prisoner's institutional conduct. The category into which any marijuana or cocaine offense falls depends on the amount of the illegal drug involved in the commission of the offense. The most severe category for marijuana ("Very High") is one step below the most severe for cocaine ("Greatest I"). The total quantity of each drug involved in these conspiracies was not shown at trial. However, "Note 4" of the "Guidelines" states that "[i]f an offense behavior involved multiple separate offenses, the severity level may be increased." In light of the careful scrutiny which must be accorded the possibility of collateral consequences inherent in the concurrent sentence doctrine, *United States v. Rubin*, 591 F.2d 278 (5th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979), we are satisfied we should review the defendant's conviction on Count Two. *See Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572, 578 n. 1 (1969); *United States v. Holder*, 560 F.2d 953, 955–56 (8th Cir. 1977); *cf. United States v. Warren*, 612 F.2d 887, 889 (5th Cir. 1980) (en banc) (court declined to pass on validity of concurrent sentence doctrine).

cocaine conspiracy weakens any inference of the defendant's culpability which might be drawn from the evidence.

We simply do not believe that this evidence establishes beyond a reasonable doubt that the defendant knew of or willingly joined in a conspiracy to possess cocaine with the intent to distribute. See *United States v. Harbin*, 601 F.2d at 783–84.[8]

Accordingly, we affirm the defendant's conviction on Count One of the indictment, but reverse as to Count Two.

AFFIRMED in part and REVERSED in part.

---

8. The defendant also argues that the government proved, at most, only one agreement to deal in both marijuana and cocaine and that, consequently, his conviction for two separate conspiracies cannot stand. Our reversal of his conviction on Count Two obviates the need to address this issue. *Cf. United States v. Rodriguez*, 612 F.2d 906 (5th Cir. 1980) (en banc).