633 F.2d 1184
 7 Fed. R. Evid. Serv. 1017
 UNITED STATES of America, Plaintiff-Appellee,
v.
Fred E. BARTLETT, Jr., Defendant-Appellant.
 No. 79-5523.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 9, 1981.
 
 Mark J. Kadish, Atlanta, Ga., for defendant-appellant.
 Samuel A. Wilson, Jr., Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before VANCE, FRANK M. JOHNSON, Jr., and THOMAS A. CLARK, Circuit Judges.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 Fred E. Bartlett, Jr., an attorney, appeals from his conviction in the Middle District of Georgia for violations of 18 U.S.C. §§ 152 and 371 (1976) (amended 1978). Bartlett was initially indicted with four other defendants; one co-defendant's trial was severed while the other co-defendants pleaded guilty and two of them testified against Bartlett. Count One of the indictment charged Bartlett with conspiracy to knowingly and fraudulently conceal property with intent to defeat the bankruptcy law and with making a false oath or account in or in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 371. Count Two charged him with knowingly and fraudulently transferring and concealing property with intent to defeat the bankruptcy law in violation of 18 U.S.C. § 152. Count Four charged Bartlett with making a false oath during a bankruptcy hearing.[1] The jury found Bartlett guilty on each count as charged and he received a two-year sentence on each count to run concurrently.
 
 
 2
 In 1974, attorney Bartlett was hired by Robert L. Herring to provide Herring and his brothers with legal services on various corporate matters. Herring revived a dormant closely held family business, Herring Feed & Grain (H.F. & G.), and asked Bartlett to form Herco as a wholly owned subsidiary of H.F. & G. that would purchase and sell heavy earth moving equipment. Apparently Bartlett also helped form three other closely held corporations-Superior Equipment, Herco Transportation & Leasing (Herco T & L) and Southern Ventures, LTD. (SVL)-which existed primarily to receive and dispose of Herco's assets.[2]
 
 
 3
 Although Herco was a subsidiary of H.F. & G., it was clearly doing more business than H.F. & G. and in 1975 Bartlett suggested to Herring that H.F. & G. be dissolved.[3] Eventually Herco experienced financial difficulties and filed a voluntary petition for bankruptcy in April 1978. Herco's difficulties were caused partly by Herring's actions: he used Herco as a bulldozer dealer to procure financing (over $1,200,000 from five financial institutions) for sales of nonexistent bulldozers. Consequently Herring, whose case was severed from the instant case, was convicted of racketeering in United States v. Herring, 602 F.2d 1220 (5th Cir. 1979), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732. Another source of Herco's problems was that by the time its petition was filed it had no viable assets.[4]
 
 
 4
 The issues at trial focused on Bartlett's knowledge of various corporate transactions and his voluntary statements made at Herco's bankruptcy hearing. Bartlett prepared the bankruptcy petition which made no mention of SVL even though Bartlett held a warranty deed from Herco to SVL that purportedly transferred a 273 acre farm to SVL; he also knew about two other land transactions between Herco and SVL.[5] Moreover, all of Herco's corporate minutes were signed at one meeting; as secretary to the directors, Bartlett was the one responsible for "updating" those minutes.[6] Finally, Bartlett was charged with making a false oath when he denied under oath that he knew who the principals of SVL were.[7]
 
 
 5
 On appeal, Bartlett's primary contention is that the trial court's actions during trial deprived him of his right to a fair and impartial trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. His second major contention is that the trial court made certain errors in its charge to the jury. We have examined each of the points raised on appeal and we find no reversible error. Accordingly, we affirm.
 
 
 6
 Bartlett asserts that the judge's intervention during the trial prejudiced his right to a fair and impartial trial. After Bartlett had been examined by his own counsel and the prosecutor for a total of 121/2 hours (over a two day period), the court immediately began its own examination that exceeded an hour. Bartlett contends that during this cross-examination the court overstepped the bounds of impartial judicial inquiry and became a "surrogate prosecutor." Moreover he cites various exchanges between the court and counsel as evidence of the court's bias against the defendant.
 
 
 7
 We have examined the record as a whole and conclude that Bartlett received a fair trial. Moore v. United States, 598 F.2d 439, 443 (5th Cir. 1979). Following our common law heritage, a judge is not a mere moderator, and he has an obligation and duty to question witnesses and comment on the evidence when necessary. Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); United States v. Jacquillon, 469 F.2d 380, 387 (5th Cir. 1972). In fact a trial judge may elicit facts not yet adduced or clarify those previously presented and he may maintain the pace of the trial by interrupting and curtailing counsel's examinations as a matter of discretion. Moore v. United States, supra, 598 F.2d at 442; United States v. Hill, 496 F.2d 201, 202 (5th Cir. 1974); Kyle v. United States, 402 F.2d 443, 444 (5th Cir. 1968).
 
 
 8
 Only when the judge's conduct strays from neutrality is a defendant thereby denied a fair trial as required by the Constitution. See United States v. Middlebrooks, 618 F.2d 273, 277 (5th Cir. 1980); United States v. Daniels, 572 F.2d 535, 541 (5th Cir. 1978). That was not the case here as we find the trial judge's cross-examination was a sincere attempt to clarify Bartlett's most equivocal testimony. United States v. Middlebrooks, supra, 618 F.2d at 277. On the whole, the court's questions attempted to illuminate Bartlett's intent, which we view as a material issue in a prosecution for concealing assets. Cf. United States v. Evans, 574 F.2d 1287, 1288 (5th Cir. 1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458; Accord: United States v. Guglielmini, 384 F.2d 602, 606 (2d Cir. 1967), cert. denied, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970).
 
 
 9
 Moreover, our review of the record failed to show that the trial judge improperly commented on the credibility of any of the witnesses.[8] United States v. Freeman, 619 F.2d 1112, 1122 (5th Cir. 1980). The court acted well within its discretion when it requested Bartlett to refer to the Georgia Code to enable him to provide more informative answers to the court's questions. United States v. Vida, 370 F.2d 759, 768 (6th Cir. 1966), cert. denied, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630. Finally, we find that the trial judge was aware of the sensitive role he plays in the eyes of the jury and that his cautionary instructions that the jury was not to draw any improper inferences from his interventions were adequate. United States v. Middlebrooks, supra, 618 F.2d at 277. While we agree that the record reflects some tension between the court and defense counsel, we find that the incidents cited fail to disclose any conduct on the part of the trial judge that gives rise to a constitutional violation. United States v. Abrams, 568 F.2d 411 (5th Cir. 1978), cert. denied, 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133.
 
 
 10
 Bartlett's next contention on appeal concerns the court's charge to the jury. He argues that the court erred in allowing the false oath count (Count Four) to go to the jury because the questions asked of him were ambiguous and because the evidence was insufficient to support a conviction on this count. Further, he contends that the court improperly converted a question of law regarding the dissolution of H.F. & G. into one of fact for the jury consideration. Finally he alleges several errors in the court's general charge on Count Four and in its specific charge on the definition of the word "principals."
 
 
 11
 It is axiomatic in this Circuit that the jury charge as a whole must be examined to see if the jury was misled and whether the defendant was thus prejudiced. See, e. g., Mid-Texas Communications Systems, Inc. v. American Tel. and Tel. Co., 615 F.2d 1372, 1390 (5th Cir. 1980); Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1100 (5th Cir. 1973). We have examined the charge as a whole and find no prejudice to the defendant and, therefore, no error. The court properly instructed the jury on the Government's burden of proof on the false oath count and the other counts as well. See, e. g., United States v. Jessee, 605 F.2d 430, 431 (9th Cir. 1979); cf. United States v. Whitaker, 619 F.2d 1142, 1149 (5th Cir. 1980); United States v. Kehoe, 562 F.2d 65, 69 (1st Cir. 1977).
 
 
 12
 We find that the evidence in toto was more than sufficient to support a conviction on each of the counts charged. United States v. Haymes, 610 F.2d 309, 311-12 (5th Cir. 1980).[9] We find that the remainder of Bartlett's claims of error are without merit; consequently we
 
 
 13
 AFFIRM.
 
 THOMAS A. CLARK, Circuit Judge, dissenting:
 
 14
 I respectfully dissent. The false oath part of the indictment (Count IV)[1] should have been dismissed as requested by defendant. It does not specify what Bartlett allegedly lied about. His motion for a bill of particulars asking for those specifications was denied. Furthermore, the evidence does not support the conviction. Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), teaches, in an opinion by Chief Justice Burger, that to sustain a conviction under the federal perjury statute[2] the witness must understand the question and knowingly give a false answer. The following excerpts are illuminating:
 
 
 15
 Petitioner's perjury conviction was founded on the answers given by him as a witness at that bankruptcy hearing, and in particular on the following colloquy with a lawyer for a creditor of Bronston Productions:
 
 
 16
 "Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?
 
 
 17
 "A. No, sir.
 
 
 18
 "Q. Have you ever?
 
 
 19
 "A. The company had an account there for about six months, in Zurich.
 
 
 20
 "Q. Have you any nominees who have bank accounts in Swiss banks?
 
 
 21
 "A. No, sir.
 
 
 22
 "Q. Have you ever?
 
 
 23
 "A. No, sir."
 
 
 24
 It is undisputed that for a period of nearly five years, between October 1959 and June 1964, petitioner had a personal bank account at the International Credit Bank in Geneva, Switzerland, into which he made deposits and upon which he drew checks totaling more than $180,000. It is likewise undisputed that petitioner's answers were literally truthful. (a) Petitioner did not at the time of questioning have a Swiss bank account. (b) Bronston Productions, Inc., did have the account in Zurich described by petitioner. (c) Neither at the time of questioning nor before did petitioner have nominees who had Swiss accounts. The Government's prosecution for perjury went forward on the theory that in order to mislead his questioner, petitioner answered the second question with literal truthfulness but unresponsively addressed his answer to the company's assets and not to his own-thereby implying that he had no personal Swiss bank account at the relevant time.
 
 
 25
 We might go beyond the precise words of the statute if we thought they did not adequately express the intention of Congress, but we perceive no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert-as every examiner ought to be-to the incongruity of petitioner's unresponsive answer. Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. It should come as no surprise that a participant in a bankruptcy proceeding may have something to conceal and consciously tries to do so, or that a debtor may be embarrassed at his plight and yield information reluctantly. It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry.
 
 
 26
 A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether "he does not believe (his answer) to be true." To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication."
 
 
 27
 409 U.S. at 353-55, 358, 359, 93 S.Ct. at 597-98, 600. (Footnotes omitted.)
 
 
 28
 At trial the prosecution and the questioning by the the trial judge[3] focused on the truthfulness vel non of Bartlett's answer to the last question in which he denied knowing the principals of Southern Venture, Ltd. Bartlett persisted in his testimony that he understood "principals" in the context of the question to connote officers and directors that had been appointed by the corporation, and Bartlett's answer was literally true. Reverting to the lesson of Bronston, supra, if the questioner had pursued the inquiry, he could have determined that Robert Herring had initiated the incorporation of Southern Venture, Ltd. and was its beneficiary and controlling individual. Had Bartlett persisted in his denials to a more adequate line of questioning, the jury might then, and only then, have had a sufficient basis upon which to convict under the statute.
 
 
 29
 It is clear to me that between the trial judge's questioning of Bartlett, reflected in footnote 3, and his instructions to the jury,[4] the jury concluded that Bartlett was guilty because he did not answer the question by naming Robert Herring as principal. For these reasons I would reverse with directions to dismiss Count IV of the indictment.
 
 
 30
 I also would reverse as to Counts I and II. In order to convict, the jury had to find that Bartlett knew his actions aided and abetted his clients in their criminal fraud. He in no way profited from the monies the other defendants criminally procured, unless the payment of a $3,900.00 fee during the period could be so classified. His work seemed to warrant a fee in that amount. He testified that he prepared the incriminating title transfer documents at the request of his clients, without knowledge that fraud was involved. Hindsight indicates extreme carelessness. Actual knowledge that fraud was being perpetrated by his clients has to be inferred.
 
 
 31
 The closeness of the evidence coupled with the conduct of the trial causes me to conclude that Bartlett did not receive a fair trial, and a new trial should be granted as to Counts I and II. No one or even two incidents would lead me to this conclusion. However, the totality of the conduct and unusual circumstances leads me to conclude that the jury verdict could have been influenced by matters other than the evidence and instructions.
 
 
 32
 The cross-examination of Bartlett and the jury instruction on the definition of "principals," previously discussed, reflect a prosecutorial tone on the part of the trial judge.
 
 
 33
 Prior to trial Bartlett, through counsel, filed a motion for recusal based on his belief that the judge was biased because of tensions between them at the recent trial of Robert Herring.[5] Bartlett represented Herring in that trial. Herring was originally a co-defendant in this case. It was Bartlett's representation of Herring's corporations that gave rise to Bartlett's becoming a defendant in this case. In response to the initial motion for recusal, which was renewed several times prior to verdict, the trial court remarked as follows:
 
 
 34
 THE COURT: As you know, and you can let Fred (Bartlett) testify, he and I grew up together around the corner from each other, played together, I knew his mother and whole family. He is unfortunately not the first person I grew up with who has been in court to be tried, but a judge is not supposed to be a person who has no knowledge of life or no knowledge of people. But remember, I am not judging his guilt or innocence. Twelve people are judging his guilt or innocence.
 
 
 35
 The court denied the motion.
 
 
 36
 Another significant incident was the court's sua sponte instruction[6] to the jury just prior to the testimony of Austin Herring, a co-defendant, who had entered into a guilty plea agreement pursuant to Federal Rule of Criminal Procedure 11(e).
 
 
 37
 I do not agree with the majority opinion, which relies upon United States v. Rosson, 441 F.2d 242, 244 (5th Cir. 1971), and United States v. Freeman, 619 F.2d 1112, 1122 (5th Cir. 1980), that this instruction was "proper and more favorable than not to the defense." I read the instruction to be tantamount to the trial judge vouching for the truth of the testimony of the co-defendants by assuring the jury that he held the threat of a five-year sentence over the co-defendants.
 
 
 38
 During the bench conference following this instruction, defense counsel moved for a mistrial and renewed the motion for recusal. During the exchange, which became heated, the trial judge shook his finger at defense counsel within the view of the jury. Numerous other incidents, as I read the record, lead me to conclude that the treatment of the defense was not evenhanded when compared to that afforded the prosecution. Defense counsel was pressed to move along, the Government was not. The court intervened frequently when defense counsel was at the podium, but not when the prosecutor was questioning.
 
 
 39
 I do not suggest that the trial judge had a fixed impression as to Bartlett's guilt. But the jurors had no window to the judge's mind. Like all of us they could only take their clues from what they observed. The atmosphere of the trial was sufficiently clouded by the judge's conduct during trial, his examination of the defendant, and his vouching for the credibility of certain Government witnesses to taint the jury's verdict. Believing that the verdict might have been different without these incidents, I dissent.
 
 
 
 [1]
 Bartlett was not charged in Count 3 of the indictment
 
 
 [2]
 The Government alleged that each of these corporations-Superior Equipment, Herco T & L, and SVL-was a dummy corporation. The record reflects that these corporations did not have any paid-in capital, that their corporate accounts were all drawn on checks issued by Herco, that many of their corporate papers and transactions were improperly recorded, and that each corporation (except SVL) had virtually identical officers and directors
 
 
 [3]
 It is disputed whether H.F. & G. was dissolved (the Secretary of State issued dissolution papers) or consolidated with Herco (since H.F. & G.'s stockholders were virtually identical to Herco's stockholders). It is undisputed that Herco's voluntary bankruptcy petition listed H.F. & G.'s property as an asset and that H.F. & G.'s assets were not distributed to its stockholders as required by Ga.Code Ann. § 22-1312 (1977)
 
 
 [4]
 Its bulldozers had been repossessed by finance companies and all of its other assets had been either sold or transferred to one of the dummy corporations
 
 
 [5]
 Bartlett was directly involved in forming SVL. He traveled to Nassau at Herring's direction for the purpose of contacting a Bahamian law firm, Higgs & Johnson, that would actually do the incorporation. The record contains several letters between Bartlett and Higgs & Johnson and evidence of at least two meetings between him and the law firm. In fact, it was Bartlett who thought up the name, Southern Ventures
 
 
 [6]
 One witness testified that the purpose of this meeting was not simply to formalize roughly-drafted minutes but rather was for the purpose of preparing for Herco's imminent bankruptcy. The minutes were all signed approximately one month before the petition was filed
 
 
 [7]
 On June 1, 1978, Bartlett gave the following testimony during a bankruptcy proceeding:
 "Q Today, there were some questions concerning the transactions with Southern Ventures, Limited. Could you describe those transactions from the inception as you recall the transactions?
 A Mr. Raney, I did the following work on those things: I drew up the deeds to the property in Worth County, had them executed and filed. I drew up mortgages for property here in Dougherty County and had them executed, tangible tax, and filed. I later drew up a deed from Herco Corporation to Southern Venture, Limited, and had it executed by officers of the corporation and filed.
 Q In connection with those, could you give us the "substance of the transactions"?
 A Well, there wasn't no-What do you mean, "Substance of the transactions"?
 Q Well, why were they entered into? Well, first of all. You are talking about deeds and mortgages. Can we take each parcel or group of parcels and discuss-
 A Well, basically, all I know about the transaction is this: That R. L. stated that they had bought some equipment from a company, Southern Ventures, Limited. Three hundred and fifty-six thousand dollars. They had agreed to transfer the property in Worth County for fifty-six thousand dollars and he wanted deeds drawn up for that amount. That was the downpayment on the equipment. That they were going to give them a mortgage on other property for three hundred thousand. I think they executed some notes at first for three hundred thousand. I'm not sure that they even gave a mortgage at that time.
 Q Now you were saying that first fifty-six thousand was-the total transactions was for three hundred and fifty-six thousand?
 A That's the way I understood it.
 Q To purchase certain equipment?
 A That's right.
 Q And that equipment was being purchased from Southern Ventures, Limited?
 A Right.
 Q Was that pursuant to a contract of sale, or how did you know the firm was involved in a sale?
 A The only knowledge I have of that is what Mr. Herring told me.
 Q Did you confer with the other side in drawing those documents up?
 A No, sir, I did not.
 Q You had no conversations anyone?
 A No, sir.
 Q You just drew up the deeds?
 A Yes.
 Q Pursuant to the instructions of R. L. Herring?
 A Yes, sir.
 Q Did you ever go to the Bahamas to discuss the transactions?
 A I went to the Bahamas, but I didn't discuss the transaction.
 Q You never met anybody from Southern Ventures, Limited?
 A No, sir.
 Q Do you know the principals of that corporation? Who they are?
 A No, sir."
 Record, Vol. 5, at 542-544.
 The following is a portion of Bartlett's testimony on March 28, 1979, before the grand jury:
 Q "Now what I want to know, you didn't know Southern Venture was incorporated until sometime after the 25th of March. So how in the world could Southern Venture be selling equipment to Herco Corporation on March 15th?"
 A "Mr. Wilson, I know that Southern Venture had a corporate charter. But I also knew that it had no officers or directors. I did know that the only person having any beneficial interest that I knew of was Robert Herring. He was the person who directed Southern Venture. He did now (sic) qualify as an officer or director but he was the alter ego of it. There was no question about that. He could deal for them."
 Q "Even back in March of 1977?"
 A "Yes sir. He was the beneficial owner of it. See, many of these corporations down there even though they've got these capital, they have nothing but nominee shareholders and that's the way I understand the purpose of that, it is just for that purpose."
 Q "What purpose?"
 A "That they don't want anyone to know who owns the corporation."
 Q "Now the question I asked you, you didn't know until March 25th, 1977 or after that the company was in fact incorporated?"
 A "I knew in January of 1977 who the beneficial director of that company was. It was Robert Herring. He was the one that set it up. He was the only person who could act for it at that time."
 Record, Vol. 13 at 1335-37.
 
 
 [8]
 During oral argument before our panel, Bartlett strongly argued that the court's sua sponte instruction to the jury explaining the co-defendants' plea agreement effectively vouched for the credibility of those witnesses since the court emphasized that it was not bound by the plea agreement and that each of them faced a possible five year sentence. We find the court's instruction was proper and it was more favorable than not to the defense. See United States v. Rosson, 441 F.2d 242, 244 (5th Cir. 1971). In fact the court did not follow the recommendation for a six month sentence; the co-defendants who testified for the Government were each sentenced to eighteen months, just six months less than Bartlett
 
 
 [9]
 Bartlett focuses his argument as to Count Four on the ambiguity of the word "principals" and the evidence relating thereto. He spent a great deal of time during trial and on this appeal arguing that he thought "principals" meant officers and directors of SVL and that he did not actually know the names of the nominee officers and directors at the time of the Herco bankruptcy hearing. In view of Bartlett's later grand jury testimony, the jury was certainly entitled to reject Bartlett's interpretation of the meaning of "principals." United States v. Dioguardi, 428 F.2d 1033, 1036 (2d Cir. 1970), cert. denied, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54
 
 
 [1]
 Count IV charged that Bartlett "knowingly and fraudulently did make a false oath as to a material matter in and in relation to said proceeding in that he testified as follows in answer to questions propounded:"
 Then follows the questions and answers appearing in the first portion of footnote 7 of the majority opinion, which will not be repeated here, followed by:
 When, in truth and fact as FRED E. BARTLETT, JR., then and there well knew: FRED E. BARTLETT, JR. had on or about February 16, 1977, caused Southern Venture Limited to be incorporated in the Commonwealth of the Bahamas by arranging with persons at the law firm of Higgs & Johnson, Nassau, Bahamas, to incorporate said company, use the Higgs & Johnson law firm office address as the address of Southern Venture Limited, and select persons to serve in name only as officers and directors of Southern Venture Limited; also as FRED E. BARTLETT, JR. then and there well knew, Southern Venture Limited had no business and operated in name only with stated paid in capital of Five Dollars ($5.00); all in violation of 18 U.S.C. § 152.
 
 
 [2]
 Bronston involved a prosecution under 18 U.S.C. § 1621, the general perjury statute, arising out of testimony given in a bankruptcy proceeding, whereas Bartlett was convicted under 18 U.S.C. § 152, punishing anyone who "knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding ...." The principles enunciated in the former case have no less force in the case at bar
 
 
 [3]
 Following is the part of the court's questioning on the issue of the meaning of "principals":
 EXAMINATION BY THE COURT:
 Q Mr. Bartlett, look at the index to the Georgia Code and tell me where you find the work (sic) principal spelled p-r-i-n-c-i-p-a-l to be used in those sections of the Goergia (sic) law which you normally have been acquainted with in your practice.
 A Judge, they have principal involved in two or three things. You have judgment for principal. Of course that is for money which is-
 Q That's common usage for the word principal, isn't it?
 A Yes sir.
 Q That is amount of money that's involved on something?
 A Principal and agent, that is where you have one person acting for another.
 Q Is that one you are familiar with?
 A I am familiar with that. It has agents of a corporation. I have looked up some law under that. It's not really defined in Georgia. The only case bearing on it is the Vardiman (phonetically) case which states officers as such of the corporation.
 Q Read the jury what it says as to agency, the word principal means.
 A "The relation of principal and agent arises whenever one person expressly or by implication authorizes another to act for him or subsequently ratifies the acts of another in his behalf."
 Q Were you familiar with that term at the time you represented R. L. Herring or not?
 A Yes sir. I am familiar with the difference between a principal and agent. But that's not what a principal of a corporation is. Principals of a corporation is a mixed question.
 Q What other section of the law is the term principal used in?
 A Principal and surety.
 Q That's where a person goes on like a bond and the principal is the main obligor and the surety is is (sic) the person who backs him up, isn't he?
 A Yes sir. Principal and guarantor. There are soem (sic) technical distinctions between the two.
 Q Now when you went down to the Bahamas and saw the law firm of Higgs and Johnson did you or did you not tell that law firm that Mr. R. L. Herring was the individual in whose behalf you were there?
 A No sir.
 Q Well, upon whose instructions did the law firm act as to that corporation?
 A Mine and Spencer Lee's. We were the ones who told them what to do.
 Q Did you ever tell them that Mr. R. L. Herring was the person behind that corporation?
 A I don't know whether I ever did or not, Your Honor. I do not recall ever telling them that. I may have at a later time. Or he may have told them. I don't know.
 Q Well, who do you think the law firm in the Bahamas considered to be the person who was authorized to make decisions as to this corporation?
 MR. KADISH: Objection, Your Honor. That question would be an improper question because what the law firm in the Bahamas thinks-nobody would know what they think.
 THE COURT: I said who did he think.
 A THE WITNESS: The law firm understood that I was representing a person or group of people. They knew this. But they did not know who they were. And I know that in the inception. Now whether or not I later discolsed (sic) that to them at Mr. Herring's agreement or insistence or permission I do not know.
 Q Well, if the law firm took instructions from you and you don't know anything about all those Caterpillars that supposedly were swapped for land how could the corporation have acquired those Caterpillars without your having known about it and having told the lawyers down there to prepare paper work and do whatever was necessary?
 A They did not prepare any paperwork. Nothing was prepared on behalf of Southern Venture that I know of. Mr. Herring simply stated he had some Caterpillar tractors.
 Q How could the title get into Southern Venture though if you as a representative did not have anything to do with it?
 A It is not necessary that they were in Southern Venture. If Mr. Herring owned them he could have transferred them to Herco and had the payment made to Southern Venture.
 Q Did he have payment made and if so did you transmit it down there so they could put it in the bank?
 A The only payment was the transfer of property.
 Q Oh. A bank account was never opened. Is that right?
 A As far as I know no bank account was ever opened.
 Q All right. We've got a lot of corporate charters here that were organized that have been testified to. As to Herco Transportation and Leasing and Superior Equipment, tell these ladies and gentlemen of the jury when you perceived that those corporations came into genuine legal existence under the laws of this state.
 A All right, Judge.-
 Q Here is the corporate code if you need to refer to it.
 A I don't think I need to refer to it.
 MR. KADISH: May the witness have the charters please?
 THE COURT: Oh, yes sir.
 MR. KADISH: Your Honor, may we approach the Bench.
 MR. KADISH: Since Your Honor has taken the liberty to begin the cross examination of the witness which you are permitted to to (sic) examine the witness as a Federal judge, and since the examination is getting rather lengthy and since you have pointed out to him from a book that principal means principal agent I have here from the ALR index under principal agent a reference that principal agent also refers to corporate officers and agents in this index.
 THE COURT: You can ask him when I get through-
 MR. KADISH: I would like the Court to ask him from this same document.
 THE COURT: You can ask him whatever you want to.
 MR. KADISH: Most respectfully and humbly to show the Court's neutrality now that I have pointed this out to the Court I would ask the Court to call to the jury's attention that under principal and agent there is a section that is commonly seen in a very well known legal jurisprudencial (sic) research reporter under corporate officers and agents in this index. That's all I would like you to do.
 THE COURT: I will pull the index and look at it. I sure will as soon as we take a break and see what it says. The fact that it is in the index doesn't mean anything. I will give you ample time to argue about what the word means.
 END BENCH CONFERENCE.
 THE COURT: Do you gentlemen have those charters?
 A THE WITNESS: O.K. Herco Corporation was duly incorporated on the 10th of October, 1974.
 Q That's what it says on that sheet of paper, isn't it?
 A Yes sir.
 Q But when under the law did that corporation come into legal existence?
 MR. KADISH: I object, Your Honor, to the question. As I understood it Your Honor prohibited the witness from testifying as to certain questions of law like that saying that the Court would instruct. I just would object to the Court's question as that being a legal conclusion for the jury to determine on the Court's instructions.
 THE COURT: The Court is trying to find out if the witness is familiar with the law because he is on trial for supposedly not as a lawyer doing what the law requires.
 MR. KADISH: I understand. But most respectfully-
 THE COURT: Whether or not he knows it is a question that the Court deems it necessary to find out about.
 MR. KADISH: I understand that. And I wouldn't have made the objection but most respectfully I remember asking questions of that nature, I believe-
 THE COURT: Of this witness?
 MR. KADISH: Yes. Where the Court has prohibited me from going into questions of law because you said you would instruct on it. I may be wrong but that's what I thought.
 THE COURT: If I prohibited you, sir, after I finish I will back up and permit you to ask him any question along those lines that you would like.
 MR. KADISH: I just would object because this is within the province of the jury and I think should be kept there, most respectfully.
 
 
 [4]
 The charge in Count 4, ladies and gentlemen, is not that just one particular question was answered falsely. The charge instead is that a series of questions considered as a whole were answered either wholly or partly in a false manner. You look at all of what the defendant was asked. Some of it you may find to be true; some of it you may find to be false; all of it you may find to be true; all of it you may find to be false. It is only necessary that you find some substantial part of the whole to have been falsely stated under oath for you to find a verdict of guilty
 Now you have heard several words used, one of which is nominee. What does the word nominee mean? If we look at Black's Law Dictionary it says the word nominee means one who has been nominated or proposed for an office. It also says the word means one designated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee.
 Now the words (sic) principal has been discussed. What does that word mean, ladies and gentlemen? First of all, as we look at Webster's New World Dictionary, the Second College Edition which happens to be the only one that I have available in the courthouse that's a regular edition, it defines the words (sic) principal as first in rank, authority, importance, degree. That is or has to do with principal as a noun. A principal person or thing, specifically a chief head, a governing or presiding officer, specifically of a school. A main actor or performer. In finance it refers to the amount of a debt, investment, minus the interest or on which interest is computed, the face value of a stock or bond. In law, a person who employs another to act as his agent. The person primarily responsible for an obligation. A person who commits a crime or is present as an abetter to it.
 Now if we go further and we look in Black's Law Dictionary, that says, as a (sic) adjective, the word means chief, leading, most important or considerable, primary, original, highest in rank, authority, character, importance or degree. It's used to refer to a principal establishment or place of business as being the main establishment or place of business. The principal domestic establishment. As a noun it refers to the source of authority or right, a superintendent, as of a school district, the capital sum of a debt or obligation as distinguished from interest or other additions to it. In criminal law, a chief actor or perpetrator, or an aider or abetter as I have already defined it for you. In the law of agency the employer or constitutor of an agent, the person who gives authority to an agent or attorney to do some act for him.
 You have before you a corporate registration form which is in evidence. You will see that the word principal is used upon it. I believe in that case it has principal office, main office is what that means. Where is your principal office? You will see on there it has principal officer, principal directors, I believe; principal officer, main officer, main directors.
 It is for you to determine what Mr. Bartlett understood the word principal to mean when he was asked to answer a question which is written in that indictment and to that question concerning the word principal he answered no. Look at all of those questions. Consider all of them as a whole, and determine whether or not beyond a reasonable doubt, considering the testimony as a whole, one or more of those questions has been proved by the Government beyond a reasonable doubt to have been falsely made, knowingly and fraudulently, in accordance with the elements given you by the Court.
 I further call to your attention that at the end of Count 4 the charge says when in truth and fact Fred E. Bartlett, Jr., then and there knew certain things. The Government, ladies and gentlemen, does not have to prove that Mr. Bartlett knew exactly what it alleges in this indictment that he knew. This is only notice to him of the charge. You base your finding as to whether or not he falsely testified knowingly and fraudulently, based upon what the evidence shows he knew at the time he testified, whether it be just what is set forth in this indictment as notice to him or whether it would be less or more. Whatever the evidence shows Mr. Bartlett knew at the time he testified is what you base your decision on as to whether or not he then testified falsely, knowingly and fraudulently.
 
 
 [5]
 United States v. Herring, 602 F.2d 1220 (5th Cir. 1979)
 
 
 [6]
 (The Court) Ladies and gentlemen, at the conclusion of the case in instructing you on the law that is applicable to the case, the Court will again tell you that it is your duty to judge the credibility of every witness to determine whether or not you will believe the witness, whether or not you will believe all or any part of what a witness says. For that purpose you are entitled to know all about the witness, including in this instance the fact that under the terms of that agreement this witness has entered a plea of guilty and is here testifying. And I remind you that just as it is your duty to determine whether or not beyond a reasonable doubt the defendant is guilty of the charges set forth herein and which are being tried, it is the Court's duty to determine what sentence, if any, is to be imposed upon any defendant who either enters a plea of guilty and is thereby convicted or is convicted after being tried before a jury. Under the laws of the United States as applied to this particular situation the decision of what sentence is to be imposed rests solely in the hands and the mind of the trial judge. Of course there is always the possibility that a defendant, appearing as a witness, can endeavor to make a good impression upon the trial judge who is sitting next to him for the purpose of trying to get a favorable sentence. There are many possibilities. You take into consideration that it is this judge who sits next to this witness in whose hands the determination of what sentence he is to receive lies. He has not yet be (sic) sentenced and will not be sentenced until after this case has been completed.... Now there is a mention in that plea agreement that the United States will recommend that this judge give this defendant no more than six months actual time to serve in the penitentiary. That recommendation is not binding upon this judge. The law in this instance, I think you are entitled to know, permits this judge to sentence this man to an actual term of imprisonment for up to five years. That is the possibility of the situation. None of that will be determined until a later date. I think you are entitled to know that the possibility of five years is hanging over his head at this very moment. (Emphasis added.)