**UNITED STATES of America,**
**Appellee,**

v.

**James V. CANESTRI, Appellant.**

**No. 1138, Docket 75–1143.**

United States Court of Appeals,
Second Circuit.

Argued June 20, 1975.

Decided June 30, 1975.

Thomas F. Maxwell, Jr., Asst. U. S. Atty., D. Conn., Bridgeport, Conn. (Peter C. Dorsey, U. S. Atty., D. Conn., on the brief), for appellee.

Ira B. Grudberg, New Haven, Conn. (Jacobs, Jacobs & Grudberg, New Haven, Conn., on the brief), for appellant.

Before LUMBARD, GIBBONS,* and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

James V. Canestri appeals from a judgment of conviction entered March

---

* United States Circuit Judge for the Third Circuit, sitting by designation.

17, 1975, in the District of Connecticut (Zampano, J.) following a trial at which a jury found him guilty of three counts of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d). Canestri was sentenced to concurrent terms of 18 months in prison on each count. On appeal he argues that the district court erred in not suppressing as evidence the three unregistered firearms involved in this case. United States v. Canestri, 376 F.Supp. 1149 (D.Conn.1974). We affirm.

On October 16, 1972, Anthony Mezzonotte of Orange, Connecticut, reported to the police that his home had been burglarized and that 18 valuable antique guns had been taken. Three days later the Orange police department sought a warrant to search the home of Joseph Canestri, the teenage brother of the defendant in this case. In the affidavit presented to the magistrate to justify the issuance of the search warrant, two officers of the Orange police department recited (1) that the robbery described above had occurred, and that certain guns, which they described, had been taken; (2) that an informant known to one of the officers had seen antique handguns on the Canestri premises (four of which were described and noted as fitting the descriptions of four of the stolen guns); (3) that a fellow officer had advised the two affiants that Joseph Canestri had been found to be in possession of stolen property on an earlier occasion that year; (4) that a reliable informant, who had furnished information leading to convictions in the past, had seen three handguns similar to those taken from the Mezzonotte home in the possession of Kenneth Davis; and (5) that Kenneth Davis and Joseph Canestri were known to be friends and associates. On the basis of this affidavit a judge of the Connecticut Circuit Court issued search warrants authorizing the search of both the Canestri and Davis homes.

When the police officers arrived at the Canestri home, they were admitted by Mrs. Canestri, the mother of the defendant and Joseph Canestri. In the course of their search the officers found narcotics paraphernalia in Joseph's room. In the basement the officers encountered a locked room. After breaking into the room they found some seventy guns including the three guns that were seized as contraband and that were the subject of the motion to suppress.[1] In addition to those three guns, the officers seized one knife and five guns that had been listed by the National Crime Information Computer Center as having been stolen and one other gun that they thought was contraband.

## I.

Canestri contends first that the affidavit in support of the search warrant did not provide probable cause for a magistrate to believe that the stolen antique guns were at the Canestri home because the affidavit failed to establish the reliability of the first unidentified informant who claimed to have seen the guns there. Canestri places principal reliance on Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964),[2] where the Supreme Court held that a magistrate cannot properly issue a search warrant based on information given to the police by an unidentified informant unless "the magistrate [is] informed of some of the

---

1. The antique weapons were not found on the Canestri premises. However, in return for a promise not to prosecute anyone for the theft of those guns and not to prosecute the Canestri brothers under any drug laws (more drug-related equipment and some suspected narcotics were found in the locked room in the basement), Joseph Canestri, who arrived home midway in the search of the locked room, was given an opportunity to see if he could locate the stolen antique guns and turn them over to the police. Later that night he gave the police all but one of the guns taken from the Mezzonotte home.

2. Since we find that the affidavit here was sufficient under Aguilar and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), we have no occasion to consider whether those two cases were modified by United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

underlying circumstances from which the informant concluded that the [guns] were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.' " 378 U.S. at 114, 84 S.Ct. at 1514.

Here there is no problem with the first part of the *Aguilar* test; the informant stated that he personally saw the four guns at the Canestri home. Canestri claims, however, that the affidavit fails to meet the second part of the *Aguilar* test because it "completely fails, directly or indirectly, to provide a basis for a finding of reliability" as to the informant. We disagree.

■ The affidavit states that the informant was known to one of the officers for a period of two years, but the informant is not described as reliable or trustworthy. However, the use or nonuse of the word "reliable" to modify the word "informant" does not alone make an affidavit either sufficient or insufficient. The issue is whether all the information contained in the affidavit is sufficient to allow a magistrate to conclude that the informant's information is reliable. Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). See also United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Likewise, the failure to give details about the reliability of information given by the informant to the police in the past is not relevant. The issue is whether the present information is relia-

ble. United States v. Harris, *supra*, 403 U.S. at 581–82, 91 S.Ct. 2075.

■ Here we agree with Judge Zampano that the affidavit contained sufficient corroboration of the first informant's statement such that the magistrate could conclude that the informant was reliable. First, the informant described four of the antique guns that he saw at the Canestri home. The descriptions were almost identical with those of four of the guns taken from the Mezzonotte residence.[3] The Supreme Court has recognized that when an informant provides information to the police which matches information that the police have gathered on their own, it is evidence that the informant is reliable. Spinelli v. United States, *supra*, 393 U.S. at 417–18, 89 S.Ct. 584, discussing Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See United States v. Cummings, 507 F.2d 324, 329 (8th Cir. 1974); United States v. Marihart, 472 F.2d 809, 815 (8th Cir. 1972) (en banc), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); United States v. Roman, 451 F.2d 579 (4th Cir. 1971), cert. denied, 405 U.S. 963, 92 S.Ct. 1171, 31 L.Ed.2d 239 (1972).

■ Second, in this case the affidavit revealed that the officers had been informed by a fellow officer that Joseph Canestri had been found in possession of stolen property on an earlier occasion in that same year. While an officer's knowledge of the reputation of the object of a search is not alone enough to justify the issuance of a warrant, Spinel-

---

**3.** In recognition of the importance of the correspondence between the informant's description of what he saw at the Canestri home and the guns known to have been taken from the Mezzonotte home, Canestri attempts to argue that the descriptions were not at all similar. We are unconvinced.

To us the four guns described by the informant (listed below in parens) are amazingly similar to four of the guns listed as stolen from the Mezzonotte home: "A six barrels pepper pot with solid metal (rotating multi-barrel revolver); silver pin fire guns with built in cleaning rods and hammerless (a hammer-

less revolver); 31 calibre nichel [sic] plated hand guns with a five inch barrel and no trigger guard (a nickel plated revolver without a trigger guard); a twenty inch 45 calibre belgium hand gun with a lip at the end of the barrel (a revolver with a very long barrel).

Now it is true that the informant described all the guns he saw as "revolvers" while the list of stolen weapons called them "hand guns," but we do not believe that anyone reading the two lists would think that different guns were involved—especially since antique weapons such as these are rare to begin with and since a revolver is a type of handgun.

li v. United States, *supra*, 393 U.S. at 418–19, 89 S.Ct. 584, when the affidavit recites the basis for the reputation reported by the officer, it is a factor that can be taken into account along with others. United States v. Harris, *supra*, 403 U.S. at 581, 91 S.Ct. 2075, discussing Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Third, the affidavit revealed that a known associate of Canestri's had also been seen (by the informant who had previously given reliable information to the police and whose reliability was not challenged here) with guns that appeared to match some of those taken from Mezzonotte.

▇ In light of these three factors, we agree with the district court that the affidavit was sufficient to justify the issuance of the search warrant by the Connecticut Circuit judge. In such a situation, the Supreme Court noted in *Aguilar*, it is appropriate to give "substantial deference to judicial determinations of probable cause." 378 U.S. at 111, 84 S.Ct. at 1512. The affidavit was sufficient to justify the issuance of the search warrant. See United States v. Viggiano, 433 F.2d 716 (2d Cir. 1970), cert. denied, 401 U.S. 938, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).[4]

## II.

▇ On its face the search warrant directed the officers to search the entire Canestri house. In the course of the search the officers learned that a locked storeroom in one end of the basement of the house was used by James Canestri (the defendant, whose brother Joseph was the object of the search). Mrs. Canestri, the mother of James and Joseph, claimed that she did not have a key to the storeroom.

Canestri argues that the police had no right to search the storeroom. He compares his situation to that of a hotel guest or tenant and notes that an innkeeper or landlord could not authorize the search of a guest's or tenant's premises. He goes further and claims that the warrant which described the premises to be searched as the Canestri home somehow did not include the storeroom once Mrs. Canestri told the police that she did not have a key to it and that it was used by "Jimmy." We disagree.

The warrant directed that the entire house be searched. As the district court noted, to exclude the storeroom from the scope of the warrant "on the facts of this case, would be to suggest that the purposes of a search warrant could be frustrated by the mere declaration of the owner of a one-family residence that one of the rooms therein 'belongs' to a party not named in the warrant." 376 F.Supp. at 1153. Such a result would clearly be inappropriate. See United States v. Jordan, 349 F.2d 107, 109 (6th Cir. 1965); Walker v. United States, 117 U.S.App.

---

4. The sufficiency of the affidavit is more clearly demonstrated by comparing the affidavit involved here with those considered in *Spinelli* and *Harris*. In *Spinelli*, where the affidavit was found to be insufficient, there was no explanation of how the informer acquired his information. Here the informant saw the guns at the Canestri home. In *Spinelli*, the only corroboration of the informant's reliability was the fact that the police knew the object's reputation to be that of a bookmaker and that the object had been seen going into an apartment that had two phones in it. Here the informant's reliability was corroborated by the officer's knowledge concerning Canestri's prior involvement with stolen property and by the striking similarity in the description of the guns the informant saw and the guns that were stolen. Thus, the affidavit here provided much more information from which a magistrate could determine whether probable cause existed than did that in *Spinelli* (where three of the eight justices would have held that the affidavit was sufficient).

In *Harris*, the corroboration was provided by the personal observation of the informant (as was the case here) and the fact that the defendant had been involved in the same crime before (as was the case here). While the informant here did not make a statement against his penal interest as did the informant in *Harris*, this informant gave a description of guns that was almost identical with those taken in the robbery. In addition, there was the added factor of the connection between another person who had been seen with the stolen property (Davis) and Canestri. Thus, we think that the instant affidavit was as sufficient as that upheld in *Harris*.

D.C. 151, 327 F.2d 597, 600 (1963), cert. denied, 377 U.S. 956, 84 S.Ct. 1635, 12 L.Ed.2d 500 (1964).

Moreover, as the district court found, a locked storeroom is a natural and logical place to hide stolen guns, and, despite Canestri's assertions to the contrary, there was no evidence presented at the suppression hearing which showed that Joseph Canestri did not have access to the storeroom.

The storeroom was part of the premises that the officers were directed to search. Under these circumstances, the district court correctly concluded that the storeroom was within the scope of the search warrant.

### III.

 Finally, Canestri argues that even if the police were properly in the locked storeroom they exceeded the scope of the warrant when they seized the three weapons that formed the basis of the indictment because they knew those weapons were not among those listed in the warrant and because they had no reason to believe that the sawed-off shotgun and the two automatic weapons were contraband. Specifically Canestri contends that the officers had no reason to believe that the three weapons were unregistered and serviceable.[5]

In making this argument Canestri placed considerable reliance on cases that have condemned general searches and that have indicated that when the police execute a search warrant, they may only seize those items that are listed in that warrant. See, e. g., Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); United States v. Dzialak, 441 F.2d 212 (2d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971).[6]

However, a long recognized exception to this general rule is that "where a police officer has a warrant to search a given area for specified objects, and in the course of the search comes across some other article of incriminating character, the property is seizable under the plain-view doctrine." United States v. Pacelli, 470 F.2d 67, 70 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973), citing Coolidge v. New Hampshire, 403 U.S. 443, 465, 514–16, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In this case the weapons seized as contraband were found when the officers searched a cabinet in the storeroom. At that time they were still looking for the antique guns listed in the search warrant so there is no question that the officers came across the guns seized as contraband in the course of the authorized search.

Since the police were properly in the storeroom and since the discovery of the seized weapons was within the proper scope of the authorized search, the only issue is whether the officers had probable cause to believe that those three weapons seized (two automatic weapons and one sawed-off shotgun) were contraband. We think that they did.

While it is possible for a person to register and therefore possess legally a sawed-off shotgun or an automatic

---

5. If the three weapons had been registered, no federal law would have been violated. See 26 U.S.C. § 5861(d). Moreover, the government has never suggested that possession of such guns, if registered, would have violated state law. See, however, Conn.Gen.Stat.Ann. § 53–202.

 Canestri, however, is incorrect in suggesting that if the weapons had been unserviceable, they would not have been contraband. Unserviceable weapons are exempt from the Act only in that they are not subject to tax on transfer. 26 U.S.C. § 5852(e). They still must be registered. 26 C.F.R. § 179.91. See also 26 C.F.R. § 179.90.

6. Canestri's claim that this was a general search seems to be based on the fact that it took the officers three hours to check the serial numbers of the seventy weapons found in the storeroom with the National Crime Information Computer Center to determine if they were stolen. We need not decide whether that activity was or was not proper since the weapons with which we are concerned were seized because the officers thought that they were contraband based on their appearance and not as a result of a report from the computer.

weapon, it is not a prerequisite for a legal seizure that the officers know at the time of the search that the seized weapons were not registered. United States v. Story, 463 F.2d 326, 328 (8th Cir.), cert. denied, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); United States v. Cecil, 457 F.2d 1178, 1180–81 (8th Cir. 1972); United States v. Zeidman, 444 F.2d 1051, 1054 (7th Cir. 1971); United States v. Ciaccio, 356 F.Supp. 1373, 1378 (D.Md.1972).[7]

As the Ninth Circuit noted in Porter v. United States, 335 F.2d 602, 607 (1964), cert. denied, 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965), "a sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances." In 1972, there were less than 15,000 registered sawed-off shotguns in the United States, most of which were registered to governmental agencies for training purposes or to residents of Western states. United States v. Cecil, *supra,* 457 F.2d at 1182 n. 1 (Heaney, J., dissenting). In light of these circumstances we think that the district court properly concluded that the officers had probable cause to believe that the seized weapons were contraband. United States v. Story, *supra;* United States v. Cecil, *supra;* United States v. Zeidman, *supra;* Porter v. United States, *supra;* United States v. Ciaccio, *supra.*[8] Thus, when the officers discovered the automatic weapons and the sawed-off shotgun in the course of an authorized search and had probable cause to believe that Canestri's possession of those items was in violation of federal law, it was their duty to seize those weapons.

Affirmed.

**7.** As the Eighth Circuit noted in *Cecil,* "[w]e know of no rule which requires an officer to have knowledge of all the elements of the crime when he views an article which reasonably appears to be contraband. A requirement that an officer must know the fact of nonregistration before seizing a contraband firearm would stultify the enforcement of the National Firearms Act." 457 F.2d at 1180.

**8.** Although these cases all concern sawed-off shotguns, we think that the same considerations apply to automatic weapons, which are popularly called machine guns.