**UNITED STATES of America, Appellee,**

v.

**Leroy PERRY, Leroy Butler, Charles Cameron, Donald Dewees, Arthur Gibbons, and Willie Earl Patterson, Appellants.**

Nos. 783, 997, 998, 999, 1051 and 1052, Dockets 79–1407, 79–1456, 79–1458, 79–1477, 79–1486 and 79–1496.

United States Court of Appeals, Second Circuit.

Argued June 16, 1980.

Decided Feb. 9, 1981.

As Amended March 19, 1981.

Rehearing and Rehearing In Banc Denied May 13, 1981.

Jerome H. Field, Brooklyn, N. Y., for appellant Leroy Perry.

Lawrence K. Feitell, New York City (Ozro T. Wells, New York City, on brief), for appellant Leroy Butler.

Lawrence K. Feitell, New York City, for appellant Charles Cameron.

Irving Perl, New York City, for appellant Donald Dewees.

Marguerite Spencer Hines, New York City, for appellant Arthur Gibbons.

Peter J. Maloney, New York City (Harold B. Foner, Brooklyn, N. Y., on brief), for appellant Willie Earl Patterson.

Laurence A. Urgenson, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the E. D. N. Y., Harvey M. Stone, Victor J. Rocco, Asst. U. S. Attys., Brooklyn, N. Y., on brief), for appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and NICKERSON, District Judge.*

OAKES, Circuit Judge:

This case, dealing with the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 841(a)(1), 846, is here on appeal from judgments of conviction in the United States District Court for the Eastern District of New York, Jacob Mishler, Judge. This appeal presents a novel question—whether members of a single distribution network for substances (mannite and quinine), which are themselves legal and uncontrolled but which are used as agents for cutting heroin, can be prosecuted for one conspiracy by virtue of their common source, their knowledge of one another's position in the network, and their intent that the uncontrolled substances would be used as cutting agents, despite the fact that the conspirators were simultaneously involved in different independent networks which distributed the illegal element, heroin. Put another way, where the raw heroin utilized for manufacture of the final "street" product did *not* come from a common source or from a new common pool, may there be conspiratorial liability for selling uncontrolled dilutant compounds to the different and, so far as appears, unconnected heroin dealers? My colleagues affirm on the basis that appellants were properly convicted under 21 U.S.C. § 846 for conspiracy to violate 21 U.S.C. § 841 by aiding and abetting the distribution of heroin.[1] I disa-

---

* Of the Eastern District of New York, sitting by designation.

1. The appellants were sentenced as follows:
 On December 7, 1979, appellant Willie Earl Patterson was sentenced to a prison term of seven years, a special parole term of five years, and fined $10,000. Appellant Charles Cameron was sentenced to a prison term of five years and a special parole term of five years. The court suspended imposition of sentence upon appellant Leroy Perry and imposed a five-year term of probation to run concurrently with a special parole term imposed on May 11, 1978, in the Southern District of New York, *see United States v. Gibbons*, 602 F.2d 1044 (2d Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979).
 On December 14, 1979, appellant Arthur Gibbons was sentenced to a prison term of thirteen years, five months, and a special parole term of life to run concurrently with a sentence im-

gree, but because two of the principal alleged coconspirators were themselves substantial heroin dealers I would hold that any error as to them (and their respective confederates) was harmless. I would, however, reverse as to appellant Donald Dewees.

FACTS

The facts need not be spelled out in great detail. One Canadian pharmaceutical source of mannite and quinine, Joel Merling, sold vast quantities of these uncontrolled substances which are, and in certain cases were proven to be, used as heroin cutting agents, or "diluents" (although they can be used, respectively, for laxative or medicinal purposes), to a New Yorker, Hyman Lieberman. Lieberman stored the substances in his store on the lower East Side of Manhattan and resold them with the aid of Israel (Paddy) Pollack. Pollack was friendly with and had access to various members of the black community in Harlem, including the appellants and other people in the drug business.

In July of 1974 Lieberman and Pollack employed Gerald Gewirtz to pick up and unload incoming shipments of mannite and quinine, and to make deliveries to Pollack's customers. Gewirtz, apprehended on another charge in June 1976, became an informant and thereafter for six months made deliveries of some seventy-four boxes of mannite weighing twenty pounds each to appellants, their apartments, their vehicles, their stores or shops, and, in the case of Leroy Butler, his New Jersey home. These deliveries were monitored, that is, they were under police surveillance. Sales prices to appellants totaled tens of thousands of dollars, and credit was extensively used. Gewirtz testified as to heavy mannite-quinine traffic and his deliveries in late 1976 were substantiated by photographs and tape recordings.

The other chief Government witness was Frank Lucas, the well-known Harlem drug trafficker who is currently serving consecutive federal and state prison terms totaling seventy years. Lucas testified as to transactions with appellant Butler throughout 1974 in which Butler gave him mannite and quinine in exchange for heroin. These transactions took place at the Audubon Garage in Washington Heights. The garage was owned by a corporation in which Butler was a stockholder and on behalf of which appellant Arthur Gibbons at one point served as a leasing agent. Lucas on occasion played cards with Butler and Pollack at the Audubon Garage, and Gewirtz made a number of mannite-quinine deliveries there. Lucas's and Butler's dealings were arranged during meetings either at a Harlem social club or at the Bridge Apartments (located across the street from the Audubon Garage) where Butler had an apartment and where, from time to time, Gewirtz also brought mannite and quinine to Butler or to Willie Earl Patterson. Lucas testified to three sales of heroin to Butler in 1974: one in late spring or early summer of a half kilo paid for by Butler with $60,000 and an amount of mannite and quinine; a second in mid-summer of a half kilo delivered to Butler at the Bridge Apartments; and a third sale in late 1974 of a half kilo paid for in "cash and cut."

Lucas also testified to appellant Charles Cameron's association with Butler, as well as Cameron's own statements about delivering "bundles" (packages containing fifty-five bags of heroin) for Butler, later distributing them in Washington, D. C., and Miami, and meeting with a source for heroin passingly familiar to regular readers of Second Circuit opinions.[2] In addition, Gewirtz testified that Pollack told him that

posed on May 9, 1978, in the Southern District of New York, *see Gibbons, supra.*

On December 21, 1979, appellant Leroy Butler was sentenced to a prison term of fifteen years, a special parole term of ten years, and fined $25,000. Appellant Donald Dewees was sentenced to a prison term of eight years and a special parole term of twelve years.

2. We refer to Ralph "The General" Tutino, who appeared among the *dramatis personae* in, *e. g., United States v. Barnes,* 604 F.2d 121 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Cameron was a heroin dealer whose payment was guaranteed by Butler and to whom Pollack sold as a favor to Butler, thus tying Cameron to Butler during the period of the indictment. Cameron himself also stipulated that he received three boxes of mannite in 1976 intending to sell and distribute it with knowledge and intent that it would be mixed with heroin.

Lucas further testified to purchases of mannite and quinine from appellant Donald Dewees and his sale to Dewees of an eighth of a kilo of heroin in 1974, as well as Dewees's complaints about needing higher quality heroin. The record gives no indication, however, that during the period of the conspiracy Dewees was a heroin dealer,[3] though he was tied to Cameron, who, immediately after the first delivery to him by Gewirtz, went to one of Dewees's bicycle stores at 125th Street and Fifth Avenue. Dewees was also linked to Butler by way of a payment book in Butler's possession bearing the name Arthur Dewees, Arthur being appellant's middle name. After his arrest and *Miranda* warnings Dewees commented that his arrest "must be for conspiracy because he hadn't made any moves [*i. e.,* purchases or sales of narcotics] for a long time." And in the course of three deliveries of mannite or quinine by Gewirtz, Dewees gave him or Pollack a total of $20,400 for Pollack or Lieberman.

Appellant Patterson, who owned a variety shop at 125th Street and Fifth Avenue,[4] was even more closely tied to Butler. On four occasions deliveries were made to him at the Bridge Apartments garage between 178th and 179th Streets, across from the Audubon Garage where Gewirtz had previously delivered, and was subsequently to deliver, mannite for Butler. When stopped on one occasion after leaving the Bridge Apartments garage, Patterson claimed that the boxes (of mannite) in his car trunk contained popcorn. Testifying in his own defense Patterson conceded that he had known Butler and had been at Butler's New Jersey home (where various deliveries were made), though not in 1976, despite the fact that a detective observed his brown Cadillac there on October 14, 1976. Patterson also testified to being at the Butler-owned Audubon Garage (where some deliveries were made to Butler), but only to use the parking facilities.

Gibbons, who owned Joe's Barbershop and was himself a street dealer, and Leroy Perry, the "old man" who worked for Gibbons, bought large quantities of mannite and quinine from Pollack for which Gibbons was often in debt. Gibbons and Perry are tied if at all to the Butler heroin enterprise only by the following facts: on one occasion Gewirtz picked up a bag of quinine from Perry at the Eighth Avenue and 131st Street barbershop, which he delivered together with a box of mannite on an "emergency" basis (according to Pollack) to Dewees; Gibbons stated after his arrest (and *Miranda* warnings) that he had bought heroin from Pollack at the Audubon Garage, well uptown from the barbershop; Gibbons stipulated that he had leased the Audubon Garage in 1974 on behalf of the 264 Audubon Corporation to one Ellie Williams and one Isaac Hamilton, indicating a possible garage relationship between Gibbons and Butler.[5]

## DISCUSSION

### A. *Jury Instructions*

The appellants object to that portion of the jury charge quoted in the margin[6] on

---

3. In one conversation, when Gewirtz got too friendly for Dewees's taste, Dewees stated that he just made pennies and did not know what his customers did with the mannite.

4. Patterson's variety store apparently was a few doors away from one of appellant Dewees's bicycle shops.

5. Gibbons and Perry also stipulated to separate *conversations in 1977 with others relating to* heroin or mannite sales. Gibbons's conversa-

tions were with two of his codefendants in *United States v. Gibbons,* 602 F.2d 1044 (2d Cir.), *cert. denied,* 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979).

6. The conspiracy charged in this indictment is limited to the alleged conspiratorial activity relating to dealing in manite [*sic*] and quinine, and imported by Lieberman and Pollack, and then sold and distributed by Lieberman, Pol-

the basis that it failed to restrict the conspiracy of which they were accused to a conspiracy whose object was the distribution of heroin.[7] Judge Mishler did tell the jury that "[t]he conspiracy charged in this indictment is a conspiracy to deal in heroin." He advised the jury that neither mannite nor quinine was a controlled substance, and that the charge was conspiracy to distribute a controlled substance or to possess with intent to distribute a controlled substance. The court also repeatedly charged, however, that "[t]he conspiracy charged in this indictment is limited to the alleged conspiratorial activity relating to dealing in manite [sic] and quinine," and that the Government had to prove that the defendants had agreed "to deal in manite [sic] and quinine with the intent and with the knowledge that it was to be used for mixing with heroin."

■ After careful review of the charge as a whole we essentially agree with appellants' assertion and conclude that the jury charge centers on the allegation that the appellants had agreed to distribute diluents with the intent that they be used in heroin distribution, rather than on the allegation that they had agreed directly to distribute heroin. We believe that the intention on the part of the appellants that their concerted efforts aid the distribution of heroin defines what the trial judge meant when he said that the conspiracy charged was "a conspiracy to deal in heroin," and that no juror could reasonably have understood those instructions to mean that in order to

convict the jury had to find that the defendants were all part of one heroin distribution network. Thus we conclude, on the basis both of the charge and the colloquy preceding it, that the defense attorneys were not misled as to the elements which Judge Mishler deemed the Government must prove. Having so concluded, we reach the principal question, whether those elements charged constitute a conspiracy in violation of 21 U.S.C. § 846.

In addition, the judge properly included in the jury charge the possibility of multiple conspiracies, in language which we substantially approved in *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979); *United States v. Taylor*, 562 F.2d 1345, 1351 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); and *United States v. Tramunti*, 513 F.2d 1087, 1107 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).[8]

### B. Conspiracy

■ On the key question in the case my colleagues are of the opinion that appellants were all shown to have agreed to distribute diluents with the intent that they be mixed with heroin and distributed by one or more heroin networks and that this was sufficient to sustain a conviction under 21 U.S.C. § 846 for conspiring to violate 21 U.S.C. § 841 by aiding and abetting the distribution of heroin. They hold that the knowing supply of a raw material necessary for the commission of a crime by another constitutes aiding and abetting that crime.

---

lack and Gewirtz to Butler, Patterson, Donald Dewees, Andre Dewees, Arthur Gibbons, Leroy Perry and Charles Cameron.

This is the conspiracy the government is required to prove.

. . . . .

What the evidence in this case must show . . . is that the members [of the conspiracy] in some way . . . came to a mutual understanding to deal in the manite [sic] and/or quinine that was exported from Canada . . .

7. The indictment also could be viewed as ambiguous as to the conspiracy charged. The indictment states that it was part of the conspiracy both that "certain of the defendants and co-conspirators . . . would receive quantities of mannite and quinine to be mixed with

heroin" and that "various defendants and co-conspirators would knowingly and intentionally distribute quantities of heroin." However, we believe that these specifications should be read solely as alleged as overt acts, and that in any event Judge Mishler's charge to the jury resolved any possible ambiguity.

8. The court charged, "to find a defendant guilty you must find that he was a member of that conspiracy charged in the indictment and not some *subsequent* conspiracy" (emphasis added). The word "subsequent" was used here in place of the word "other" in the charge approved in other cases, but the defendants did not object to this.

Under 18 U.S.C. § 2(a) whoever "aids, abets, counsels, commands, induces or procures" the commission of a crime is punishable "as a principal," and under 18 U.S.C. § 2(b) whoever "causes" the commission of a crime is likewise punishable "as a principal." While conspiracy is a crime distinct from the substantive crime which is the object of the conspiracy, 18 U.S.C. § 2 does not create a separate crime. It simply makes an aider and abettor a principal, and one who aids and abets a violation of a statute has violated that statute. *Nye & Nissen v. United States*, 336 U.S. 613, 618–20, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949); *United States v. Oates*, 560 F.2d 45, 53–55 (2d Cir. 1977).

They point to other circuits that have affirmed convictions for conspiracy to aid and abet a crime, *United States v. Marino*, 617 F.2d 76, 78 (5th Cir. 1980) (affirming a "conviction for unlawfully conspiring to aid and abet the crime of bail jumping"), or conspiracy to "cause" another to commit a crime. *United States v. Giese*, 597 F.2d 1170, 1179 (9th Cir.) (conspiracy to cause others to destroy government property), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979); *United States v. Lupino*, 480 F.2d 720, 724 (8th Cir.) (conspiracy by at least four individuals to cause one of them to receive a firearm unlawfully), *cert. denied*, 414 U.S. 924, 94 S.Ct. 257, 38 L.Ed.2d 159 (1973); *United States v. Lester*, 363 F.2d 68, 72–73 (6th Cir. 1966) (conspiracy to violate civil rights by causing a false arrest), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967). In these cases the conspiracy was a violation of the general statute, 18 U.S.C. § 371, making it a crime to conspire "to commit any offense against the United States." The courts reasoned that an act made criminal by 18 U.S.C. § 2 is an "offense" against the United States and had no difficulty in finding a conspiracy to commit an inchoate offense. *See also Singer v. United States*, 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285 (1945) (holding as a matter of statutory construction that members of a conspiracy to aid one of their number to evade the draft violated the draft statute).

My colleagues point out that there appear to be no reported cases involving a conspiracy to aid and abet violations of the drug laws. But they hold to the view that there is no reason why the result should be different. This is because 21 U.S.C. § 846 refers to any conspiracy whose object is "to commit any offense defined in this subchapter." The crucial language is identical to that used in 18 U.S.C. § 371, and, they maintain, the congressional purpose to strengthen remedies against organized drug traffic, *United States v. Bommarito*, 524 F.2d 140, 144 (2d Cir. 1975), hardly suggests a narrower reading.

The conspiracy need not be, their argument runs, to aid only one identified heroin distribution network. To show a violation of 18 U.S.C. § 2 it is not necessary to identify any principal at all, provided the proof shows that the underlying crime was committed by someone. *United States v. Gleason*, 616 F.2d 2, 20–21 (2d Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980), and cases cited. Moreover, a defendant who simultaneously aids more than one criminal venture may be found guilty for aiding each. A single conspiracy may have more than one criminal object, and there is no reason why a single conspiracy whose objects are to aid and abet different heroin distributors should not be encompassed by 21 U.S.C. § 846.

It is true, my colleagues state, that the indictment and the jury instructions did not spell out in so many words that defendants could be found guilty of "conspiring to aid and abet" the distribution of heroin. Nor were those words mentioned by the prosecutor. But the precise language, they hold, is unimportant provided that all the elements necessary to find a conspiracy to aid and abet were fairly put to the jury. Certainly, they maintain, the provisions of 18 U.S.C. § 2 can be read into an indictment which specifically charges only a substantive offense. *Jin Fuey Moy v. United States*, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920); *United States v. Walker*, 621 F.2d 163, 165–66 (5th Cir. 1980); *United States v. Knickerbocker Fur Coat*

*Co.,* 66 F.2d 388, 390 (2d Cir.), *cert. denied,* 290 U.S. 673, 54 S.Ct. 91, 78 L.Ed. 581 (1933).

To convict a defendant as an aider and abettor the Government must show only "that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938). The elements of the offense are: the commission of the underlying offense by someone, a voluntary act or omission, and a specific intent that such act or omission promote the success of the underlying criminal offense.

In a conspiracy to aid and abet, my colleagues' position continues, two different specific intents must be shown: that the individual intentionally agreed with the other conspirators and that one of their common objects was an intent to further the underlying offense. Chief Judge Mishler's charge to the jury contained both of these elements, and required the jury to find that the defendants intended that the diluents be used in the making and distribution of heroin.

To find such a conspiracy it is, of course, necessary to show that the defendants have agreed to pursue a common criminal objective. It is my colleagues' position that as in the case of any other conspiracy involving a drug related "enterprise," the agreement to pursue the objective of aiding several heroin distribution networks can be inferred from each individual's knowledge that others were performing related tasks and his conscious dependence on them for his own profits. This in turn can be inferred from the nature of the operation and the individual's place within it. *United States v. Barnes,* 604 F.2d 121, 154–55 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Taylor,* 562 F.2d 1345, 1352 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). The jury was entitled to draw these inferences, although they may be less compelling in the case of a

diluent distribution network than in the case of a single network distributing heroin. It would of course be insufficient to find merely that different members of a group were each aiding different heroin distributors. To show a conspiracy it is not enough to prove that a group of individuals had similar criminal aims. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The evidence examined in the light most favorable to the Government is sufficient—in my colleagues' view—to support a verdict finding appellants guilty of a conspiracy to aid and abet the distribution of heroin. The existence of a conspiracy was amply demonstrated by the testimony of Gewirtz as to his suppliers and deliveries of the diluents and by inference from each customer's constructive knowledge that other customers and suppliers were involved. The singularity of the conspiracy is evidenced, my colleagues maintain, by the single distribution network and the ties among the various defendants (particularly the close connections among Butler, Cameron, Patterson and Dewees, and between Perry and Gibbons), the operation by Pollack, a supplier, for a time out of Butler's garage, and the emergency delivery of quinine from Perry to Dewees. That the appellants' object and intent was to aid the distribution of heroin through the distribution of diluents is evidenced by the connections they individually possessed to heroin distribution networks, the massive quantities in which they dealt, and the various stipulations (Cameron) or inculpatory statements (Dewees, Gibbons, Perry) relating to their knowledge and intent. The particular heroin distribution networks aided were those of Butler and Gibbons. It is unnecessary to show that the conspiracy actually aided any particular sale of heroin since a conspiracy can be found though its object has not been achieved.

My colleagues do point to a difference between punishing an agreement to commit an act intended to aid another crime (a "conspiracy to aid and abet") and imposing conspiratorial liability on one who,

without agreement, merely assists conspirators in achieving their object (an "aiding and abetting of a conspiracy"). While the first is appropriate, they say, the second is not. *United States v. Middlebrooks*, 618 F.2d 273, 278–79 (5th Cir.), *modified in part*, 624 F.2d 36 (5th Cir. 1980). But in this case, they hold, there is clear evidence that a conspiracy existed whose object was to aid and abet a crime and that the defendants intended to assist in bringing about that crime through their concerted actions.

My own approach is entirely different. I would not reach the question whether these appellants could have been found guilty of conspiracy to aid and abet the distribution of heroin. This was not the charge under the indictment or the instruction of the court. Rather, we look to the evidence to determine whether it was sufficient to submit the issue of single-multiple conspiracies to the jury, as we said is "ordinarily" for the jury in *United States v. Armedo-Sarmiento*, 545 F.2d 785, 789 (2d Cir. 1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

On the key question in the case I start with the proposition that an individual, knowing the nature of the enterprise and the interdependence of its members, can become a member of a heroin conspiracy merely by supplying legal diluent chemicals to it. *See United States v. Barnes*, 604 F.2d 121, 154–55 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Presumably such a supplier could also be convicted of (although these appellants were not charged with) a substantive narcotics offense as an aider and abettor under 18 U.S.C. § 2. But in each such case the Government must show evidence of the particular narcotics operation that the supplier aided. *See United States v. Licursi*, 525 F.2d 1164, 1167 (2d Cir. 1975); *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 934 (1959). The question

here in my view then becomes whether the appellants can be convicted for an agreement to distribute uncontrolled substances[9] to *various* heroin operations.[10]

To be sure, there were some "horizontal" links among appellants: Perry and Gibbons were associates, as were Butler, Cameron, and Patterson, and Perry gave some quinine back to Gewirtz when Dewees needed it. But it is clear to me that the basic structure of this "enterprise," *see United States v. Cambindo Valencia*, 609 F.2d 603, 623 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), is that of a "spoke" conspiracy, *see Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), with diluents going from a central source to two or more distributors who operated independently of one another. The cases dealing with narcotics conspiracies, however, all involve combinations in which there was a common *unlawful* element—either a controlled dangerous drug coming from a common source and distributed by a combination, or a common narcotic pool drawn from various sources and utilized by the combination. *See, e. g., United States v. Taylor*, 562 F.2d 1345, 1350–54 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Tramunti*, 513 F.2d 1087, 1105–07 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). None involves a common source of diluents and *various* narcotics networks. A single conspiracy cannot be constructed in my view where the source is distributing diluents—legal substances—which ultimately go out to "spokes" that are the agents of different heroin conspiracies. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (similarity of illegal purpose of each spoke in dealing with hub does not constitute a common purpose and a conspiracy among the spokes).

*18583 Before the House Comm. on Ways and Means*, 91st Cong., 2d Sess. 329–30 (1970).

**9.** There is some evidence in the legislative history of the Comprehensive Drug Abuse Prevention and Control Act of 1970 that Congress was urged to control diluents, but it did not do so. *See Controlled Dangerous Substances, Narcotics and Drug Control Laws: Hearings on H.R.*

**10.** At the very least, the heroin operations of Butler and Gibbons were not shown to be the same.

Thus here, as in *United States v. Cambindo Valencia*, 609 F.2d 603, 626 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), the Government appears to have presented a series of transactions involving at least two groups who were, if anything, "friendly" competitors in the Harlem drug trade, and who were not fused into a single enterprise despite receiving diluents from the same distributor. Although the indictment charges only one conspiracy, the proof shows more than one. But this variance is not necessarily fatal and does not automatically require reversal. *See United States v. Miley*, 513 F.2d 1191, 1207–08 (2d Cir.) (affirming convictions despite variance), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975). "The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). It therefore in my view becomes necessary to inquire, as in *Valencia*, into the possible prejudice against particular defendants from being tried as members of a single conspiracy, the strength of the evidence offered to show the existence of particular conspiracies, and the membership of each defendant in one or more of such conspiracies involving the actual sale of heroin.

Appellant Butler is readily identifiable as a large-scale trafficker in heroin over a long period of time. Gibbons is also clearly the operator of a separate enterprise. The question, then, is whether the prejudice from evidence relating to the discrete Butler conspiracy spilled over to affect the charge against Gibbons and his confederate Perry, or vice versa. Without such prejudicial spillover, there is merely a variance between the single conspiracy charged and the two proved at trial, which would not warrant reversal. Only if prejudicial spillover is shown must a conviction be reversed. *See Cambindo Valencia*, 609 F.2d at 628–29; *United States v. Bertolotti*, 529 F.2d 149, 155–58 (2d Cir. 1975).

On the spillover question I have no problem whatsoever with Butler and his confederate Cameron. There was substantial evidence that they were engaged in a joint criminal enterprise involving the sale of heroin as to which the purchase of diluents was a necessary preliminary step in the manufacture of the street product. Butler and Cameron were operating on a large scale, Cameron sometimes alone to be sure but often as a lieutenant of Butler.

The evidence is not as clear-cut regarding Gibbons and Perry. Although Lucas's testimony—which must have been quite powerful coming from a substantial drug dealer himself—strongly indicted Butler and Cameron, it did not relate at all to Gibbons and Perry. Nevertheless Gibbons, after being advised of his constitutional rights, stated to the arresting officers that he was receiving heroin in eighth of a kilo quantities from Paddy Pollack, that several of these transactions took place at the Audubon Garage between 178th and 179th Streets in Manhattan, that the heroin would be cut into four or five hundred quarters, and that he made $12,000 from each eighth of a kilo of heroin. Without such statements, Gibbons's conviction would have to be reversed in my view, but with them, it does not.[11] I would resist the temptation, however, to tie the Gibbons enterprise to Butler through either their common source of diluents (the Audubon Garage locale of the Pollack transactions) or their possible joint interests in the 264 Audubon Corporation which owned the garage.

The question would still remain whether the other appellants' convictions may properly be upheld. Though the question is in a sense academic in the light of my colleagues' view, I believe that the appellant Patterson can be tied to the Butler conspiracy. The fact that deliveries were made to him at the Bridge Apartments opposite the Audubon Garage is not necessarily compel-

---

11. Of course this assumes that it be found that Gibbons conspired with someone else (Perry)

to violate 21 U.S.C. § 841(a)(1).

ling to show a link between Patterson and Butler. For all that appears the Bridge Apartments garage was suggested by Pollack. On the other hand, in testifying in his own defense, Patterson conceded that he had known Butler and that he had been at Butler's New Jersey home, and the jury could properly have found that he was observed there by a detective on October 14, 1976. His veracity was clearly in question by virtue of his claim, when he was stopped on one occasion after leaving the Bridge Apartments garage, that boxes of mannite he had in the trunk of his car contained popcorn. There was also ample evidence to the effect that Butler's New Jersey home was used as a heroin trading center, and I think the jury could properly infer that Patterson was connected to what I have termed the Butler conspiracy, without prejudicial spillover from proof as to the separate Gibbons conspiracy.

Dewees, too, could be tied to Butler— rather loosely I say—by way of Butler's payment book bearing Dewees's name and by the fact that Cameron, immediately after an observed mannite-quinine delivery, went to one of Dewees's bicycle stores at 125th Street and Fifth Avenue. But I cannot say that Dewees was not prejudiced by spillover of the evidence as to Gibbons's heroin dealings. Therefore I would remand as to Dewees for a new trial.

As for appellant Perry, who was something more than a "mule" but something less perhaps than a lieutenant for Gibbons, he nevertheless plainly knew, and indeed he stipulated that he knew, the "cut" was to be used in a heroin operation. Since he worked for Gibbons, the jury could properly infer that he was involved in Gibbons's heroin operation, and on this basis I see no prejudicial spillover from evidence regarding the Butler conspiracy as to Perry. There remain a number of other points for discussion, however.

## C. Double Jeopardy

Appellants Gibbons and Perry make a double jeopardy argument based on similar locale and a three-month time overlap between the conspiracy charged here and the conspiracy for which they were previously tried and convicted in the Southern District of New York, see United States v. Gibbons, 602 F.2d 1044 (2d Cir.), cert. denied, 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979). But the two indictments charged separate and distinct crimes. The instant case involves dealing in mannite and quinine with knowledge and intent that it be mixed with heroin for distribution, from July 1974 through December 1976. The Southern District conviction involved a conspiracy in which Gibbons and Perry served as a source of heroin—"wholesalers"—for at least two street sellers of heroin (also charged in the Southern District indictment) from September 30, 1976, through March 2, 1978, a period essentially subsequent to the termination of the conspiracy charged in the instant case. See Gibbons, 602 F.2d at 1046.

The Southern District case did include evidence of two incidents involving diluents, but both occurred in 1977, falling outside the Eastern District indictment. Thus, following the "same evidence" test—whether the evidence required to support conviction in one of the prosecutions would have been sufficient to support conviction in the other prosecution—and giving special consideration to the potential for abuse of this test in the context of conspiracy prosecutions, see United States v. Papa, 533 F.2d 815, 820 (2d Cir.), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); United States v. Bommarito, 524 F.2d 140, 146 (2d Cir. 1975); United States v. Mallah, 503 F.2d 971, 985–87 (2d Cir. 1974); cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), we hold that the 1974–1976 Eastern District diluent-heroin conspiracy was a crime distinct from the subsequent 1976–1978 heroin wholesale operation charged in the Southern District indictment.

## D. Search Warrant

Butler argues that evidence seized from his New Jersey home by officers from New Jersey, from New York, and from the fed-

eral government pursuant to a New Jersey warrant in June 1979 should have been suppressed. The articles—cocaine paraphernalia, guns, and $70,975 in cash found under the mattress in the master bedroom [12] —were introduced as similar act evidence. The affidavit supporting the warrant, sworn to by Detective Crowley of the Englewood, New Jersey, police force, described 1976 incidents at the Butler house as related by informant Gewirtz. It then skipped to 1979, describing less direct evidence that Butler was still in the drug business: television cameras at the front, side, and rear of the house to spot surveillance; automobiles (the usual Rolls Royces and Mercedes Benzes) linked to trafficking in the driveway or speeding away upon sight of the officers; and a statement by Mrs. Butler that, "[t]he Police know what Leroy is doing at the house, he pays a lot of people, he conducts his business out of the house every afternoon." She further stated to the officers that Butler did not live at the house and that he just came there every day to conduct his business.

 Although the affidavit omitted any reference to the reliability of the informant Gewirtz, the 1976 information was sufficiently corroborated by the 1979 events to be considered. *See, e. g., United States v. Rollins*, 522 F.2d 160, 164–65 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Canestri*, 518 F.2d 269, 272–73 (2d Cir. 1975). And staleness was not a problem because evidence on both sides of the three-year gap indicated an ongoing narcotics "business." *See Mapp v. Warden*, 531 F.2d 1167, 1171–72 (2d Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976). Indeed, when combined with the fact that Butler was a long-time suspected drug dealer, the 1979 events alone might have been sufficient to establish probable cause to believe drugs were on the premises. Bearing in mind, therefore, the deference accorded to the magistrate, *id.* at 1172, we do not reverse his determination of probable cause to issue the warrant.

Butler also claims that the supporting affidavit was false in that it referred to Pollack's Mercedes Benz being at the New Jersey house in May of 1979, which was after Pollack had absconded, and that Butler was entitled to a hearing upon motion under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to challenge the veracity of the affidavit. But this issue was not raised until after trial and, moreover, the fact that Pollack may have been a fugitive from a New York narcotics indictment does not demonstrate that the officer's observations were mistaken.

### E. *Similar Acts*

 Appellants Butler and Cameron contend that the trial judge improperly admitted evidence of certain similar acts. Specifically, Butler challenges the admissibility of various items seized during the search of his home, and Cameron challenges the admission of some of Lucas's testimony. Even if it were error to admit the evidence against Butler, on the assumption that although there was a "knowledge" or "identity" issue presented at trial of the kind justifying admission of similar acts, this evidence should have been excluded as more prejudicial than probative, *see United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980), this error was harmless because of the nature and amount of other evidence establishing Butler's guilt.

As for Cameron's objection, Lucas's testimony that he had had heroin dealings with Cameron in 1969 does present some difficulty. In order to prevent admission into evidence of a 1975 conviction Cameron had stipulated that he had sold mannite on three occasions with knowledge of its ultimate use, thus, he argues, conceding the issue of intent. But Cameron's defense in this case was that he had not joined the larger conspiracy charged. Therefore, it was not knowledge of the use of mannite as a cutting agent but rather intent to join the Conspiracy charged that was at issue;

12. Butler told the searching officers that "they must have put [the money] there."

and Cameron's stipulation regarding his prior mannite dealings did not dispose of this point. It may seem difficult to understand how 1969 events are relevant to show that in 1976 Cameron agreed to participate with other defendants in the conspiracy charged, but Cameron's defense was simply that he was a little mannite dealer, and the similar act evidence as to his large-scale 1969 narcotics dealings with Lucas and Butler contradicted this. Thus, Lucas's testimony bore on whether Cameron was part of the conspiracy charged, and the district judge properly ruled the testimony admissible.

## F. Severance

■ Perry, Patterson, and Dewees complain that they were prejudiced by the admission against the other defendants of highly damaging evidence, including inculpatory statements and stipulations as well as the testimony on similar acts. Accordingly, they claim that severance was required. While the author would agree in respect to Dewees, but him only, my colleagues believe that none of the similar act evidence was likely, in light of the cautionary instructions given, to prejudice them. See United States v. Rosenwasser, 550 F.2d 806, 808 (2d Cir.), cert. denied, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977). And a defendant's right to confrontation under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), does not come into play unless the codefendant's admission inculpates the defendant as well. United States v. Wingate, 520 F.2d 309, 313 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). That did not occur here.

## G. Summation

■ Cameron and Patterson complain about numerous remarks during the Government's summation. Absent flagrant abuse, they can only object now to remarks objected to below. United States v. Dibrizzi, 393 F.2d 642, 645–46 (2d Cir. 1968). But when appellants did object below, the court properly gave corrective instructions. Furthermore, in light of the fact that the de-

fense lawyers attacked the credibility and honesty of the Government's case in their closings, the Government's statements vouching for witnesses were understandable if not laudable; and the Government's statements describing the defense's attack as a "desperate," "struggling" tactic were permissible rebuttal. See United States v. Praetorius, 622 F.2d 1054, 1060–61 (2d Cir. 1980).

■ The prosecutor's closing statement, however, was close to the line: "I submit to you that these defendants and their counsel are completely unable to explain away their guilt." Although a jury might interpret this statement as a comment on defendants' refusal to testify, see United States v. Bubar, 567 F.2d 192, 199 (2d Cir.), cert. denied, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), we believe that the trial judge's curative instructions rendered this harmless, see id. at 200.

## H. Juror Requesting Librium

■ Appellants argue for reversal based on a note sent from one juror to her mother during deliberations, stating that she was having stomach problems, was taking tranquilizers, and needed Librium. The same juror cried when appellant Dewees was convicted. Appellants question her mental stability. See United States v. Dioguardi, 492 F.2d 70, 78 (2d Cir.) (verdict may be set aside only if there is "clear evidence of a juror's incompetence to understand the issues and to deliberate"), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). Judge Mishler carefully made a post-verdict inquiry, see United States v. Moten, 582 F.2d 654, 666 (2d Cir. 1978), and the juror explained that she had cried when appellant Dewees was found guilty because she "felt sorry" for his brother, who had been a codefendant and was acquitted, and who had wept openly when the verdict against Donald Dewees was announced. The juror also recounted that the Librium referred to in the note to her mother had been prescribed by her physician three years earlier for an ulcer condition which caused her discomfort during the trial, and stated that

she neither felt disoriented nor took tranquilizers during the deliberations. Under these circumstances, and in light of the judge's own observations regarding the juror's demeanor, he quite properly decided—at least absent any bizarre behavior by the juror—not to permit further interrogation by counsel of the juror.

### I. Investigator's Character Evidence

■ Appellant Perry argues that the district court improperly excluded the testimony of a private investigator hired by his wife, through whom Perry sought to introduce evidence of his good reputation in the Harlem community. In the judge's discretion he could properly exclude this testimony as hearsay, because the private investigator was merely going to testify as to a few conversations he had had with one of Perry's coworkers at the barbershop, with the minister of Perry's church, and with a laundry proprietor. It is well established that a character witness must be able to demonstrate his *own* familiarity with the defendant's reputation and his competence to speak for the community. *See Michelson v. United States*, 335 U.S. 469, 478, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948).

### J. Statements Pursuant to Plea Agreement

■ Appellant Perry also argues that his admission concerning receipt of mannite and quinine at Joe's Barbershop was made in connection with his offer to plead guilty and, therefore, should have been excluded under Federal Rule of Evidence 410. But when Perry advised the Government that he would not plead guilty, he violated his plea agreement, making it null and void. In the words of the agreement itself, "[a]ny ... prosecution may be premised upon any information provided by Leroy Perry during the course of his cooperation and such information may be used against Leroy Perry." Because Perry's statements were made *after* the plea agreement had been negotiated and executed with advice of counsel, and not as part of an effort to gain further concessions from the Government,

and because the express provisions in the agreement made the statements usable against Perry, the court below, relying on *United States v. Stirling*, 571 F.2d 708, 730–32 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), properly admitted them into evidence.

### K. Statements During Investigative Stop

■ Appellant Patterson argues that the court should have suppressed the statement he made when stopped on June 17, 1976, that the boxes in the trunk of his car contained popcorn. At trial the Government introduced evidence that these boxes in fact contained mannite, and offered Patterson's remark as a false exculpatory statement. The trial court properly held that the officers—who had previously observed the loading of boxes of mannite into Gewirtz's car, had followed Gewirtz to the Bridge Apartments garage, and had seen Patterson exit the garage shortly thereafter with what looked like two of the boxes on his rear seat—had probable cause to believe that Patterson was involved in a drug operation and, therefore, could stop his vehicle. In response to the officers' request for some identification, Patterson had opened his trunk to retrieve an article of clothing, at which time three additional boxes, each similar in size to the ones Gewirtz had just delivered, became visible. It was at this point, when the police officers observed the boxes and asked what was inside them, that Patterson replied "popcorn." Because this investigative stop was based on reasonable suspicion, *see United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and the officers' request for identification, in connection with which the boxes of mannite came into plain view, was permissible, *see United States v. Salter*, 521 F.2d 1326, 1329 (2d Cir. 1975), Patterson's statement need not have been excluded from evidence.

### L. Patterson's Sentence

■ Appellant Patterson argues that his sentence was unduly harsh and was not

based upon an accurate presentence report. His sentence, however—a prison term of seven years, a fine of $10,000, and a special parole of five years—was well within the limits prescribed by 21 U.S.C. § 841(b)(1)(A), which specifies a maximum term of fifteen years, a fine of not more than $25,000, and a special parole term of at least three years. Appellant Patterson's argument in essence is that he was dealing only in mannite and not in heroin. But as we have recounted above, he was properly found to be a member of the conspiracy charged, in my colleagues' view, and of a heroin conspiracy, in the author's; his sentence for that was not, as he contends, either cruel and unusual, nor unduly harsh; and of course we cannot, on appeal, review sentences simply to see whether we would have reached the same result, *see Dorszynski v. United States,* 418 U.S. 424, 440–41, 94 S.Ct. 3042, 3051, 41 L.Ed.2d 855 (1974).

In connection with Patterson's presentence report, the judge struck any information as to Patterson's alleged heroin dealings which the Government conceded was inaccurate. The judge also stated that he would disregard certain other matters, called to his attention by defense counsel, which were allegedly misleading or irrelevant. Thus Patterson's claim that his sentence was based on an inaccurate report is without merit.

M. *Presence of DEA Special Agent at Government Counsel's Table*

Appellant Perry argues that the trial court improperly allowed the Government's DEA Special Agent Rice to remain at the counsel table, despite a request under Federal Rule of Evidence 615 that he be excluded from the courtroom. But a Government investigative agent falls within the exception in Rule 615(2) for "an officer or employee of a party which is not a natural person." The legislative history of Rule 615 makes it clear that a governmental investigative agent, even though he is also a witness, may be designated to sit at the Government counsel's table. *See* S.Rep.No.1277, 93rd Cong., 2d Sess. 26 (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 7051, 7072–73.

Convictions of all appellants affirmed.

VAN GRAAFEILAND, Circuit Judge (concurring):

I agree with Judge Nickerson that all of the judgments should be affirmed, and I believe it would be helpful to state briefly why I do.

It is hornbook law that one who aids and abets the commission of a crime is as responsible for the crime as if he committed it directly. *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); *United States v. Molina,* 581 F.2d 56, 61 n.8 (2d Cir. 1978); *United States v. Campbell,* 426 F.2d 547, 553 (2d Cir. 1970); 18 U.S.C. § 2. Accordingly, a defendant who is indicted as a principal may be convicted on proof that he was merely an aider and abetter. *United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir. 1975); *United States v. Ramsey,* 374 F.2d 192, 196 (2d Cir. 1967). So also, one who is charged with conspiracy to commit an unlawful act may be convicted if he conspired to aid and abet the commission of the act. *Pereira v. United States,* 347 U.S. 1, 11–12, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); *United States v. Valencia,* 492 F.2d 1071 (9th Cir. 1974); *United States v. Lester,* 363 F.2d 68, 72–73 (6th Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967).

Appellants were charged with conspiring to violate 21 U.S.C. § 841(a)(1), which makes it unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . ." The jury quite properly could have found that appellants conspired to aid and abet the manufacture and distribution of heroin by furnishing the essential diluents, mannite and quinine, and thus were members of a drug conspiracy. *See United States v. Wolk,* 398 F.Supp. 405, 410 (E.D.Pa.1975). Whether there was a single conspiracy or multiple conspiracies was for the jury under the instructions correctly given by the district judge. *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).